**FIRST LINCOLN HOLDINGS, INC. Plaintiff,**

v.

**THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, Defendant.**

**No. 01 CIV 4455 RO.**

United States District Court, S.D. New York.

Sept. 21, 2001.

Jeffrey I. Zuckerman, Esq., Curtis, Mallet–Prevost, Colt & Mosle, LLP, New York, New York, for plaintiff.

Sidney S. Rosdeitcher, Esq., Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York, for defendant.

## OPINION & ORDER

OWEN, District Judge.

Plaintiff First Lincoln Holdings, Inc., a Delaware company engaged in real estate and investment banking, charges the defendant Equitable Life Assurance Society of the United States with breach of contract and violations of the federal securities laws and moves by order to show cause for a preliminary injunction compelling Equitable, one of the largest insurance companies in the United States and a New York corporation which administers myriad number of significant investment funds, to accept transfer requests in large amounts from one fund to another from First Lincoln via telephone, fax and other electronic means so that it may engage in a trading practice known as "market timing," a method of securities trading which involves major transfers into and out of the various investment portfolios sometimes within hours, spelled out in greater detail hereafter.[1] Equitable opposes the preliminary injunction, contending that First Lincoln cannot show irreparable harm and is unlikely to succeed on the merits, and, by cross-motion, moves to dismiss the complaint for failure to state a claim upon which relief can be granted.

Equitable's annuity products allow contract owners, investors therein, to explore various investment options or portfolios, such as the Emerging Growth Companies and MFS Research portfolios, involving U.S. equity securities, or the T. Rowe Price International Stock Portfolio and Alliance International Portfolio, invested substantially in non-U.S. equity securities. The Equitable investment product at issue is called the "Accumulator Select" and contains approximately 35 different investment portfolio options.[2] The Accumulator Select Prospectus states that it is a "deferred annuity contract" which "provides for the accumulation of retirement savings

---

1. First Lincoln emphasizes in its submissions that its motion for a preliminary injunction "[i]s based *solely upon its claim for breach of contract,* not its claims for violations of the Securities Exchange Act of 1934 and for common law fraud ... [.]" (Pl.'s Reply Mem. of Law, dated June 19, 2001, at 2 n.1) (underscoring supplied).

2. Individual investors believe they benefit from this type of product because they may transfer their investment from time to time from one fund to another without incurring certain tax consequences. Corporations, however, as more fully set forth in the Prospectus at pages 43 through 61, do not reap this tax benefit.

and for income." The product, by all accounts, is designed for long-term investors. Plaintiff First Lincoln is operated by its President, Martin Oliner, a canny and sophisticated investor who, on the record in another matter in federal court in Delaware, stated he has historically way outperformed certain other mutual funds.

Equitable's documentation of the relationship comes from a very clear and undisputed paper trail which includes the Prospectus, the deferred annuity contract and correspondence between the parties. The dispute arises from alleged oral statements which First Lincoln claims Equitable officials made to Oliner. For the purposes of plaintiff's injunction application, I consider the totality of the submissions by the parties, but as to defendant's Rule 12(b)(6) motion to dismiss, I accept all of the allegations in the complaint as true and draw all reasonable inferences in favor of First Lincoln .[3] *See In re Scholastic Corp. Secs. Lit.,* 252 F.3d 63, 69 (2d Cir. 2001).

In August 2000, Oliner met with Michael Kerstein, an Equitable Sales Agent, and the two discussed a possible investment in an Equitable annuity product. Apparently due to Kerstein's lack of experience with deferred annuity contracts, Oliner later met with Kerstein and another more senior Equitable salesman, Sidney Smith, in or about September and October 2000. Oliner unambiguously indicated that he sought to invest approximately $10 million in an annuity product. Oliner informed Smith and Kerstein that he wished to actively trade on the account and Equitable took this as a sign that Oliner wished to engage in market timing, a practice which fund managers generally dislike.

Equitable states that it advised Oliner that "round-trip" transfers of funds—investments into and out of the fund taking place within 24 hours—would be prohibited and informed Oliner that all trades were subject to a "five-day" rule, meaning that transferring funds into and out of a particular investment option within a five day period was not permitted. Oliner and First Lincoln assert that by the terms of the Prospectus advertising the annuity product and the contract, incorporating certain Prospectus terms, there was no five-day rule and that plaintiff was never orally informed of such a trading restriction.

Prior to purchasing the annuity contract, Oliner read the Prospectus, which states:

> Market Timing—You should note that the product is not designed for professional "market timing" organizations, or other organizations or individuals engaged in market timing strategy, making programmed transfers, frequent transfers or transfers that are large in relation to the total assets of the underlying mutual fund portfolios in which the variable investment options invest. Market timing strategies are disruptive to the underlying mutual fund portfolios in which the variable investment options invest. If we determine that your transfer patterns among the variable investment options reflect a market timing strategy, we reserve the right to take action including but not limited to: restricting the availability of transfers

---

**3.** Although First Lincoln did not attach the deferred annuity contract or Prospectus to its complaint, these documents are integral to its breach of contract claim. First Lincoln did attach these documents to its preliminary injunction motion, so it cannot be said that plaintiff was without notice of these documents, and accordingly, I consider the contract and Prospectus for both the purposes of defendant's motion to dismiss and plaintiff's motion for a preliminary injunction. *See Koppel v. 4987 Corp.,* 167 F.3d 125, 128 (2d Cir.1999).

through telephone requests, facsimile transmissions, automated telephone services, Internet services or any electronic transfer services.

(Equitable Accumulator Select Prospectus, at 30, Decl. of Brian O'Neil, dated June 11, 2001, ¶ 34, attached as Ex. 1.) The Prospectus also recited the prohibition of market timing trading practices in its discussion of the various electronic trading mechanisms such as the telephone, fax and internet, stating, "We reserve the right to limit access to these services if we determine that you are engaged in a market timing strategy . . . [.]"

On October 30, 2000, Oliner submitted an application for the Accumulator Select annuity contract to Equitable.[4] On the questionnaire accompanying the application, it is written that he wished to invest as a "short-term market timer." He also stated therein that he anticipated making approximately sixty transfers of funds (trades) each year and requested "same-day settlement" and a "4 p.m. cut off."[5] In response, on November 3, 2000, Alfred Akbar, Assistant Vice President of Equitable, sent Oliner a letter stating:

We have approved your application for an annuity contract. The certificate is enclosed, along with other helpful information.

The information you provided in the application suggests that you may intend to engage in market timing. Please review page 30 of the prospectus, dated May 1, 2000, which explains our prohibi-

tion against market timing. We routinely monitor transfer activity in our funds, and as explained in the prospectus we will take steps to prevent market timing.

Let me remind you that your contract gives you the opportunity to cancel the contract for any reason, without penalty, during the applicable time period stated on the contract's data pages.

(Decl. of Martin Oliner, sworn to May 23, 2001, at ¶ 30, attached as Ex. D.) Oliner states that he spoke with other Equitable sales agents who informed him that this was merely a "form letter,"[6] and, to the contrary, Equitable's sales agents claim that Oliner's statements as to this are false.

Beyond the explicit written prohibition on market timing set forth in the Prospectus, the annuity contract itself vests Equitable with considerable discretion in taking action along the way to restrict certain trading practices. For example, certain provisions explicitly contemplate Equitable's imposition of rules and policies consistent with the Prospectus:

Section 4.01   Transfer Requests

You may request to transfer all or part of the amount held in an Investment Option to one or more of the other Options. *The request must be in a form we accept.* All transfers will be made on the Transaction Date. Transfers are subject to the terms of Section 4.02 and to our *rules in effect at the time of transfer* . . . [.]

---

4.   The application and questionnaire for the Accumulator Select are attached as tear-out pages within the Prospectus itself.

5.   The "same-day settlement" and "4 p.m. cut off" language means that an investor would have until 4:00 p.m. to call in a trade and still have it executed before the closing of the business day at 5:00 p.m. (*See* Oral Argument Transcript, dated June 21, 2001, at 11.)

6.   As I made clear at oral argument, I reject plaintiff's contention that Akbar's confirmation letter was a "form letter." Moreover, I am puzzled by the good faith of First Lincoln's assertion that a letter specifically addressing a focused response to an answer in a detailed questionnaire could somehow be deemed a "form letter."

Section 4.02 Transfer Rules

The transfer rules which apply are described in the Data pages. A transfer request will not be accepted if it involves less than the minimum amount, if any, stated in the Data pages ... [.]

(Annuity Contract, Decl. of Brian O'Neil, sworn to June 11, 2001, at ¶ 41, attached as Ex. 5) (emphasis added).

The trouble began shortly after Equitable's approval of First Lincoln's application for the annuity contract. On November 6, 2000, First Lincoln transferred approximately $10 million into an equity fund, only to transfer it back out the next day. A week later, on November 14 and 15, 2000, another round-trip transfer occurred. On November 21, 2001, Steven M. Joenk, a senior vice president of AXA Client Solutions (Equitable's parent company), sent a letter to First Lincoln advising that such market timing activity did not comply with the terms of the Accumulator Select policy and stating that all further transfers would have to be made by regular mail (a format which is obviously too slow to engage in market timing). This letter resulted in a subsequent meeting where Oliner and several Equitable representatives, including Kenneth Kozlowski of the funds management group, gathered to discuss the restrictions and trading practices on the annuity contract. The timing of this meeting is the subject of conflicting affidavits: Oliner states January 2001 and Kozlowski says November 2000. Regardless of the date, Oliner states that the net of the meeting was that he was given oral assurances that his market timing trading strategies would be permitted if First Lincoln would "not trade the entire value of its account [$10 million] in any single mutual fund, and divide its account among at least three mutual funds." Equitable contends that what in fact happened at this meeting was that representatives told Oliner that it would be harder to detect a market timing strategy in these types of trades, but clearly informed First Lincoln that it could not violate the five-day rule and that market timing was prohibited. The parties obviously reached some sort of understanding, however, because Equitable restored First Lincoln's telephonic and electronic transfer privileges after the meeting.

But nothing changed, and First Lincoln continued its large and rapid trades to effectuate its market timing strategy. Letters from Equitable issued in January, February and April 2001 informing First Lincoln that it was engaged in a prohibited market timing strategy and that Equitable would take steps to limit these round-trip trades. Oliner alleges that, on the contrary, he conferred with Equitable regarding these written warnings and was told that First Lincoln could continue its round-trip trading. Finally, on May 2, 2001, apparently as a result of further First Lincoln trading activity in violation of the five-day rule, Equitable sent First Lincoln a letter restricting plaintiff's use of electronic transfer mechanisms (specifically, TOPS telephone access, EQAccess internet trading and facsimile) and limiting transfer requests to regular mail. This lawsuit followed.

Prior to addressing the legal questions, it is important to make some observations regarding the market timing trading strategy at the heart of this dispute. Market timers move their investments quickly into and out of mutual or other similar capital funds to money markets (or vice versa) based on a combination of the following factors: the different closing times of international markets and U.S. securities exchanges, the time at and manner in which mutual and other similar funds are valued and, most importantly, knowledge—eco-

nomic (for example, the Federal Reserve announces the lowering of interest rates) or other information likely to affect the market place—obtained from whatever source in the interim. As an example, assume that an annuity fund comprised largely of international securities (such as the T. Rowe Price portfolio, one of the 35 different funds into and out of which First Lincoln could transfer under the Accumulator Select contract) is valued at 4:00 p.m. on the New York Stock Exchange. Due to time differences (for example, Japan closed at 1:00 a.m. Eastern time, London at 11:00 a.m. Eastern), all the relevant international exchanges close between 11:00 a.m. and 4:00 p.m. New York time. Then, after these international exchanges close, presume the Dow Jones Industrial Average rises 200 points or some merger or acquisition beneficial to a certain range of international securities is made public. The rise in the Dow is not reflected in the value of the annuity portfolio because the value of the portfolio is based on the closing prices of the foreign exchanges at 11:00 a.m. or earlier. At that point, the market timer exploits this discrepancy based on his expectation that there is likely to be an increase in the price of the international securities on foreign exchanges resulting from the rise in the Dow, and, therefore, an increase in the value of the New York annuity portfolio; he transfers his millions out of the money market or other capital investment portfolio option and into the Rowe portfolio option loaded with international securities at 4:00 p.m. (Such transfers require fund managers to keep a great deal of cash on hand, which obviously prevents earning any reasonable rate of return on those fund assets.) Assuming the market timer is correct and the foreign securities markets open higher, the next day, the market timer transfers the millions from the Rowe international portfolio option, cashing out

of that portfolio option, back to a money market or other investment portfolio option (with, say, domestic securities) and realizes a free profit without having faced any serious risk or provided benefit to the overall condition of the annuity portfolio.

These rapid and substantial transfers are anathema to fund managers because the market timer's profit from quickly cashing out of a fund portfolio comes at the expense of the long term investors in the fund. The Third Circuit has addressed the deleterious effects of market timing practices on funds designed for long term investors seeking some protection from the potential calamity of the marketplace in *Windsor Secs., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655 (3d Cir.1993). In *Windsor*, the Hartford Life Insurance Company placed trading restrictions on a variable annuity contract which prohibited the plaintiff investment advisor from effectuating his market timing strategy. The plaintiff, an investment advisor and broker (who, as in the instant case, also served as president of the plaintiff corporation) brought suit against Hartford for a host of contract claims. In assessing the defendant insurance company's "legitimate business interests" (for purposes of plaintiff's tortious interference claim), the Third Circuit stated:

> Beginning in 1998, Hartford ... began to observe a negative impact caused by market timing activity: increased trading and transaction costs, disruption of planned investment strategies, forced and unplanned portfolio turn-over, lost opportunity costs, .and large asset swings in a fund's asset base that adversely affected Hartford's ability to provide maximal return to all contract owners.

\* \* \* \* \* \*

Hartford's concern with market timing was understandable. Market timer contracts represented only a small fraction of Hartford's 18,887 contracts, but the risks and costs associated with market timing were borne by all contract owners—few shared in market timing's benefits yet all bore its costs. As a fiduciary charged with protecting the interests of all contract owners, Hartford [by imposing trading restrictions] sought to eliminate or diminish the adverse consequences timing activity imposed on contract owners.

\* \* \* \* \* \*

These concerns [about market timing] were shared by others in the mutual fund industry and noted by the Securities and Exchange Commission. *See* Offers of Exchange Involving Registered Open–End Investment Companies and Unit Investment Trusts, Investment Company Act Rel. No. IC–16504, 53 Fed.Reg. 30,299, 30,301, 30,307 (1988). During the period Hartford devised and implemented its restrictions, other mutual funds ... began imposing "anti-timer" restrictions to mitigate the per-ceived negative effects of unrestricted timing activity.

*Windsor,* 986 F.2d at 658, 666. The SEC has recently spoken in accord on the effects of market timing in a letter dated April 30, 2001, addressed to the Investment Company Institute but explicitly stating that the information therein applies to all investment companies. The letter states:

Funds may dilute the value of their shareholders' interests if they calculate their NAVs [net asset value][7] using closing prices that were established before a significant event[8] has occurred. Dilution generally may occur, for example, if fund shares are overpriced because redeeming shareholders will receive a windfall at the expense of the shareholders that remain in the fund. Similarly, dilution may occur when a fund sells its shares at a price lower than its NAV. The risk of dilution increases when significant events occur because such events attract investors who are drawn to the possibility of arbitrage opportunities. In such situations, short-term investors may attempt to ex-

---

**7.** As set forth in the SEC letter, the Investment Company Act of 1940 instructs that funds calculate their net asset values ("NAV") by using "the market value of their portfolio securities when market quotations for those securities are 'readily available.' [T]he 1940 Act generally requires funds to determine their NAVs at least once daily, Monday through Friday, at a specific time or times as determined by their boards ... [.] Typically, funds calculate their NAVs once each day at or near the close of the major U.S. securities exchanges and markets ... [.] Funds usually calculate their NAVs by using the closing prices of portfolio securities on the exchange or market (whether foreign or domestic) on which the securities principally trade. Many foreign markets, however, operate at times that do not coincide with those of the major U.S. markets. [A]s a result, the closing prices of securities that principally trade on foreign exchanges or markets ... may be as much as 12–15 hours old by the time of the funds' NAV calculation, and may not reflect the current market values of those securities at that time. In particular, the closing prices of foreign securities may not reflect their market values at a fund's NAV calculation if an event that will affect the value of those securities ("significant event") has occurred since the closing prices were established on the foreign exchange or market, but before the fund's NAV calculation."

**8.** The market timer relies on his interstitial knowledge, that is, knowledge gained in the gaps between the times of a fund's valuation and the close of a particular exchange. As employed in the SEC letter, the term "significant event" is some event likely to impact the market, knowledge of which would be relevant to the market timer's decision to trade.

ploit the discrepancies between market prices that are no longer current, and the value of a fund's portfolio securities.

\*     \*     \*     \*     \*     \*

Arbitrage activity may also harm shareholders because it may cause funds to manage their portfolios in a disadvantageous manner. For example, a fund's investment adviser may maintain a larger percentage of its assets in cash or may be forced to prematurely liquidate certain portfolio securities to meet higher levels of redemptions due to arbitrage activity. This is particularly true for funds that invest primarily in foreign or emerging markets securities, which are often thinly traded. Funds also may incur increased brokerage and administrative costs related to the arbitrage activity.

(Letter to Craig S. Tyle, General Counsel, Investment Company Institute, from Douglas Scheidt, U.S. Securities and Exchange Commission, Associate Director and Chief Counsel, Division of Investment Management, dated April 30, 2001, O'Neil Decl., at App. 1 .) With respect to the analysis above, counsel for First Lincoln does not dispute (indeed, these issues were unaddressed) the harmful effects of market timing on funds designed for long term investors.[9]

The trading activity in this case is complex, but the nature of the dispute is not. First Lincoln claims, relying entirely on oral communications with Equitable representatives, that it is permitted to engage in market timing practices, specifically by the use of telephone, fax and internet transfer options. Equitable claims that it has always prohibited this type of trading and, more importantly, that the annuity contract and Prospectus vest Equitable with total discretion in curtailing market timing practices inimical to the interests of the fund. If one accepts Oliner's allegations at face value, its scenario is an improbable one: a highly-sophisticated investor (and attorney) who entered into an agreement containing several pronounced and explicitly written red flags not only in the Prospectus, but also in the annuity contract and Akbar confirmation letter (which also reminded First Lincoln that it could cancel the contract without penalty). Nevertheless, First Lincoln, through Oliner, persisted in the explicitly prohibited activity even after being advised in writing not to do so. Plaintiff asserts that it relied on oral communications that such activity was permissible, but has nothing to offer other than his own affidavit to show that such communications actually occurred.

■ So, turning to First Lincoln's motion for a preliminary injunction. A party seeking preliminary injunctive relief must demonstrate (1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of

---

9. Plaintiff's position is simply that there are other ways of valuing a fund which could prevent a market timing strategy and protect long term investors. Counsel stated at oral argument that Equitable should use "fair market value" to assess the fund's value. Instead of addressing how the equities tip in plaintiff's favor, First Lincoln noted, "They don't do that [use fair market value]. And I would submit, your Honor, that that's a violation [of] the SEC rules, but I'm not working for the SEC, so I'm not worried about them." I view plaintiff's silence on these issues as significant. That being said, I observe that the practice is not illegal. It is purely a matter of contract, which makes it all the more improbable and illogical that Equitable would have agreed to have First Lincoln (solely by oral agreement!) engaged in market timing without being able to hedge the fund's position or impose any rules. Plaintiff has submitted no evidence, nor commented (other than stating that Equitable wanted his $10 million), on why Equitable would be inclined to allow this behavior which, as arduously detailed, hurts other contract investors.

success on the merits or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor. *See Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 743–744 (2d Cir.2000). A showing of irreparable harm is the single most important requirement with regard to the granting of a preliminary injunction. *See Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir.1999). As such, First Lincoln must establish more than a mere "possibility" of irreparable harm; rather, plaintiff must show that irreparable harm is "likely" to occur. *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). In addition, essential to a showing of irreparable harm is the inadequacy of money damages. *See Sperry Int'l, Inc. v. Government of Israel*, 670 F.2d 8, 11–12 (2d Cir.1982). Thus, unless First Lincoln can show "[its] injury ... is neither remote nor speculative, but actual and imminent and ... cannot be remedied by an award of monetary damages," plaintiff's motion for a preliminary injunction should be denied. *Rodriguez*, 175 F.3d at 234.

■ The only statements offered regarding irreparable harm are as follows from Oliner's own declaration:

46. ... It is very difficult, however, if not impossible to quantify First Lincoln's damages, because how can we be sure as to which opportunities we would have pursued, or how much of the account we would have traded in connection with any particular opportunity.

47. ... We are quite certain, however, that we have suffered very substantially, because from November 2nd through March 31st, our profit was over $835,000 on First Lincoln's $10 million investment an annual rate of return of over 20%! At that rate, First Lincoln has lost almost $200,000 in May alone.

These statements alone defeat First Lincoln's application. First, paragraph 46 is somewhat cryptic. Certainly the company could keep a running log of the transactions and transfers it would engage in even if it cannot actually do the trades. It would simply require Oliner writing down, "Today I would trade X at Y hour at Z price, but I could not make the trade fast enough because Equitable won't let me use the telephone, fax or internet." Such a log could provide admissible evidence regarding damages. In paragraph 47, First Lincoln notes that it has already realized a huge profit (not that it has lost money) and, moreover, submits a potential damage calculation. Even if that calculation is simplistic and unreasonable, Oliner has calculated money damages. *See General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F.Supp. 1070, 1075 (S.D.N.Y.1994) ("[T]he mere necessity of making an informed approximation of damages should not preclude the adequacy of a legal remedy." (internal citation and quotes omitted)). Thus, a preliminary injunction is not appropriate because First Lincoln has an adequate remedy at law. Support for this conclusion is found in *First Lincoln Holdings, Inc. v. Franklin Advisors, Inc.*, 2000 WL 1721789 (D.Del. Nov.14, 2000). There, (the same) First Lincoln sued the Franklin Funds after defendant restricted First Lincoln's market timing activity. The district court denied First Lincoln's motion for a preliminary injunction on the basis that First Lincoln had failed to demonstrate irreparable injury, since it was possible to calculate money damages. *See First Lincoln*, 2000 WL 1721789, at *2. The district court held:

[T]he court finds that the harm First Lincoln alleges is not irreparable since [it] may be adequately compensated in money damages. [A] combination of approaches can be used to calculate First

Lincoln's loss. In his testimony, Martin Oliner ... admitted that although he does not follow a precise model, he does rely on external information to guide his trades. Mr. Oliner asserted that he has historically outperformed the [Franklin] Funds by 250–300 "points." Finally, the record indicates that it is possible to determine First Lincoln's trading history. These facts, and others, will assist First Lincoln in making a damage calculation.

*Id.* Finally, I also note that the equities do not tip in the First Lincoln's favor, the deleterious nature of market timing to long term fund investors (to whom the defendant owes certain fiduciary duties) having already been discussed extensively.

■■ Turning to Equitable's motion to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6). First Lincoln's complaint alleges three causes of action: two for fraud and one for breach of contract. The essence of plaintiff's complaint is stated in its opening paragraph:

Defendant misrepresented to the plaintiff the types of transactions in which the plaintiff would be permitted to engage, in order to induce plaintiff to invest $10 million through the defendant. After receiving and accepting plaintiff's investment, the defendant breached the contract by restricting the plaintiff's ability to move its investment among the mutual funds in which the defendant invested plaintiff's money. The defendant's conduct violated Section 10(b) of the Securities Exchange Act of 1934, constitutes common law fraud, and breaches the plaintiff's contract with the defendant.

(Compl., at ¶ 1.) I address the breach of contract claim first for the purposes of clarity.

■ Under New York law, "[T]he initial interpretation of a contract is a matter of law for the court to decide." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters,* 97 F.3d 632, 637 (2d Cir.1996) (internal marks and cites omitted). "Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." *Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir.1998). A contract is unambiguous if it "has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." *Sayers v. Rochester Tel. Corp. Supplemental Management Plan,* 7 F.3d 1091, 1095 (2d Cir. 1993). If a contract is unambiguous, I am "required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 573 (2d Cir.1993). Contractual language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation. *See United States Trust Co. of New York v. Jenner,* 168 F.3d 630, 632 (2d Cir.1999). The annuity contract admits of only one interpretation: Equitable was vested with total discretion to restrict market timing activity. The reasons for this have been made clear heretofore. The Prospectus and annuity contract are unambiguous and, therefore, Oliner's allegations (which I am accepting as true) are irrelevant because the written document controls; it provides no guarantees with respect to available trading vehicles, that is, there is no promise in the annuity contract or Prospectus that First Lincoln would have a "right" to make trades via telephone, fax or internet. Conversely, there is no provision in the annuity contract (other than the implied covenant of good faith and fair dealing) which limits Equitable's discretion regard-

ing the imposition of rules and policies on trading. Thus, First Lincoln cannot succeed on its breach of contract claim.[10]

Generally, I observe that First Lincoln's fraud claims are entirely without merit because it has made mere conclusory allegations of fraudulent intent, justifiable reliance and harm from defendant's misrepresentations. Plaintiff's complaint alleges only that Equitable made oral representations that market timing would be permissible when it never intended to make good on such oral representations. Even assuming such representations were made, "It is well-settled that the failure to carry out a promise in connection with a securities contract is normally a breach of contract and does not justify a Rule 10b–5 action." *Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir.2000). "[D]istrict courts in the Second Circuit have repeatedly rejected attempts to convert a breach of contract claim into a fraud claim by merely alleging that a contracting party never intended to fulfill its promises under the agreement." *Thacker v. Medaphis Corp.*, 1998 WL 684595, at *4 (S.D.N.Y. Sept.30, 1998). The complaint does not support a claim of federal securities fraud.

First Lincoln's common law fraud claim also fails because the Prospectus and annuity contract explicitly vest Equitable with discretion to curtail market timing and prohibit such practices. Thus, the written agreement and Prospectus alone are enough to demonstrate that First Lincoln could not have justifiably relied on the alleged representations of Equitable officials when the terms of the instrument itself made clear that such trading practices were prohibited. *See Rich v. Maidstone Financial, Inc.*, 2001 WL 286757, at *11 (S.D.N.Y. March 23, 2001) (elements of common law fraud include plaintiff's justifiable reliance on the allegedly fraudulent statement). Further, as in the securities context described above, mere allegations of breach of contract do not give rise to a fraud claim. *See Telecom Intern. America, Ltd. v. AT & T Corp.*, 67 F.Supp.2d 189, 207 (S.D.N.Y. 1999).

Accordingly, plaintiff's motion for a preliminary injunction is denied and defendant's motion to dismiss the complaint is granted.

Submit formal order on notice.

---

**10.** I am perplexed how sophisticated businessmen (and lawyers), like Oliner, engage in major seven and eight figure transactions without securing proper back-up documentation and then attempt to press a breach of contract claim relying almost entirely on oral, extrinsic communications in the face of wide-open language vesting fund managers with considerable discretion to curtail market timing practices and protect the fund. Even a cursory media search reveals the problems with such a course of conduct. *See, e.g.,* Andrew Greene, "Market Timer Sues AIM Over Agreement," *Mutual Fund Market News* (May 8, 2000) ("While often vague, the guidelines market ·timers must adhere to when trading in and out of a fund are often established in a fund's prospectus ... [.] But many funds do not define what is allowed and instead examine instances of market timing on a case-by-case basis. Fund companies may not issue specific rules on market timing because they do not want market timers pushing the limits of what is allowed ... [.]"; "[W]ritten agreements between market timers and fund companies are rare, said Carolyn Mertens, chairperson of the Society of Asset Allocators and Fund Timers of Denver. 'I haven't seen a written agreement, but it's a good idea,' she said. '[Written agreements are] specifically what we'd like to see with more mutual funds and advisors in specifying what the parameters are.' "); Mike Garrity, "Funds Strive to Restrain Market Timers," *Mutual Fund Market News* (October 25, 1999).