ANGELO, GORDON & CO., L.P., JMG Capital Partners, LLC, Sagamore Hill Hub Fund, Ltd., JMG Triton Offshore Fund, Ltd., Peninsula Capital Advisors, LLC, Guardfish, LLC, and Anda Partnership, Plaintiffs,

v.

ALLIED RISER COMMUNICATIONS CORPORATION, a Delaware corporation, Gerald K. Dinsmore, R. David Spreng, Donald Lynch, and Blair P. Whitaker, Defendants.

Civ.A. No. 19298.

Court of Chancery of Delaware, New Castle County.

Submitted: Sept. 20, 2002.
Decided: Nov. 7, 2002.
Revised June 6, 2003.

See also 805 A.2d 221.

Donald J. Wolfe, Jr., Kevin R. Shannon, Potter Anderson & Corroon, Wilmington; and Dale C. Christensen, Jr., John J. Galban, Seward & Kissel, LLP, New York City, for Plaintiffs.

Allen M. Terrell, Jr., Thad J. Bracegirdle, Richards, Layton & Finger, Wilmington; and Geoffrey S. Stewart, Daniel H. Bromberg, Jones, Day, Reavis & Pogue, Washington, D.C., for Defendants.

## OPINION AND ORDER

LAMB, Vice Chancellor.

### I.

An indenture governs an issuance of convertible subordinated notes. In the event of a "change of control" of the issuer, a Delaware corporation, the indenture obligates the issuer to repurchase the notes at face value. The pending cross-motions for summary judgment require the court to determine whether a "change of control" resulted from a recent merger involving the corporate issuer of the notes.

In the merger, the shares of common stock of the issuer were converted into the right to receive a fraction of a share of common stock of another Delaware corporation. At the effective time of the merger, those shares were both covered by an effective SEC registration statement and listed for trading on a national securities exchange. The notes themselves were issued in a private placement, and there is nothing in the indenture that *expressly* requires the issuer or any successor obligor to register with the SEC either the notes or the common shares issuable upon conversion of the notes.

The question presented turns on whether, in order to qualify as an exception to the definition of "change of control," it is enough that the shares now issuable upon conversion of the notes be part of the same class of common stock issued in the merger in exchange for the common shares. Or, instead, does the indenture *inferential-* ly require that those shares also be subject to a valid SEC registration statement as of the date of the merger?

The court concludes that the availability of the exception to a "change of control" does not depend upon any consideration of whether the shares issuable upon conversion of the notes after the merger were covered by an effective registration statement. The language of the exception was satisfied so long as (i) the common shares issued pursuant to the merger were so registered and traded on a national securities exchange, and (ii) the notes became convertible solely into common shares of the same class. Whatever obligation the issuer and its successor may have to register the conversion shares arises only under a registration rights agreement that was executed in connection with the issuance of the notes.

### II.

The plaintiffs (collectively, with others not party to this action, the "Noteholders") are investment entities that own, or manage accounts that own, $72.7 million face amount of 7.5% Convertible Subordinated Notes due in 2007 (the "Notes"). The issuer of the Notes is defendant Allied Riser Communications Corporation, a Delaware corporation with its principal place of business in Dallas, Texas (the "Company" or "ARC").[1] ARC issued the Notes pursuant to an Indenture dated June 28, 2000 (the "Indenture") between ARC, as issuer, and Wilmington Trust Company, as Indenture trustee (the "Trustee"). The

1. ARC is a facilities-based provider of broadband data, video, and voice communications. Starting in June 1997, the Company's business plan was to install the infrastructure necessary to carry voice and data traffic and other services, such as conference calling, in office buildings in the U.S. and Canada. By June 2000, the Company had agreements with real estate owners and developers to install and operate its networks in over 1,250 office buildings.

Indenture is governed by New York law. The Notes were initially convertible into ARC common stock at a price of $15.37 per share.

The Notes were sold in a private placement, without registration under the Securities Act of 1933. As described in the Indenture, each Note was to bear a legend that included the following language:

> THIS NOTE AND ANY COMMON STOCK ISSUABLE UPON THE CONVERSION OF THIS NOTE HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED.[2]

In connection with the issuance of the Notes, ARC entered into a Registration Rights Agreement for the benefit of the Noteholders. Pursuant to that agreement, ARC was required to file a shelf registration statement covering both the Notes and the conversion shares. The plaintiffs are not suing for breach of the Registration Rights Agreement; nevertheless, its terms are pertinent to the resolution of the issues presented by the pending motions.

On August 29, 2001, ARC and Cogent Communications Group, Inc. ("Cogent"), a Delaware corporation with its headquarters in Washington, D.C., announced that they had entered into a merger agreement pursuant to which each share of ARC common stock was to be converted into the right to receive 0.0321679 shares of Cogent common stock. ARC was to merge with a wholly owned subsidiary of Cogent and be the surviving entity. The Merger became effective on February 4, 2002, and ARC is now a wholly owned subsidiary of Cogent. On February 4, 2002, as mandated by Section 12.11 of the Indenture, ARC, Cogent and the Trustee executed a First Supplemental Indenture to provide that, as a result of the Merger, the Notes should become convertible into shares of Cogent common stock. The supplemental indenture also made Cogent a co-obligor on the Notes, although that amendment was not required by the Indenture.

In an earlier opinion in this case, the court denied the plaintiffs' motion for a preliminary injunction against the ARC/Cogent merger.[3] The plaintiffs were motivated to seek that injunction because the performance of ARC has been dismal in recent times,[4] and they claimed that the terms of the proposed merger were unfair to them. They asserted claims under the Indenture that, had they been successful, would have required ARC to repurchase the Notes. The court discussed but did not decide the question now presented by the cross-motions for summary judgment.

ARC has made all interest payments to date on the Notes. Because they are bal-

---

**2.** Indenture, § 2.2.

**3.** *Angelo, Gordon & Co. v. Allied Riser Communications Corp.*, 805 A.2d 221 (Del. Ch., 2002). The complaint in this matter also names as defendants, in addition to ARC and Cogent, Gerald K. Dinsmore, CEO and chairman of the board of ARC, R. David Spreng, Donald Lynch, and Blair P. Whitaker, outside members of the Company's board. Obviously, the contract-based claim at issue on this motion does not involve claims against these individuals.

**4.** For the nine months ended September 30, 2001, ARC had a net loss of $374.1 million. This extraordinary loss precipitated a write-down of its assets that resulted in ARC's insolvency. Since the Merger was announced, ARC has negotiated with Cisco Systems Capital Corp. a workout of debt senior to the Notes. Nevertheless, on a balance sheet basis, it remains insolvent. In June 2000, ARC's common stock was trading at approximately $15 per share. By September 2000, the share price had dropped below $10. Since April 2001, ARC common stock has traded below $1 per share. In January 2002, it traded in the 15 to 20 cents per share range.

loon obligations, no payment of principal is required until 2007 unless one of several provisions in the Indenture is triggered that would cause the Notes to become due and payable before that time. Examples of triggers include: (i) a voluntary or involuntary bankruptcy filing,[5] (ii) failure to pay interest,[6] and (iii) default in the performance of any covenant or warranty.[7] There is no claim before this court with regard to the first two categories. The complaint does allege that ARC has breached the covenant to "keep in full force and effect its existence, rights (charter and statutory) and franchises ...,"[8] thus triggering an event of default and accelerating the principal payment obligation on the Notes. This claim, however, is not addressed in the pending motions.

The focus of Count IV of the complaint and the cross-motions is whether the Merger constituted a "Change in Control" within the meaning of the Indenture, thus triggering a right on the part of the Noteholders to force ARC to repurchase the Notes at par. Specifically, the Indenture requires ARC to provide notice to Noteholders within 45 days of the occurrence of a non-qualified Change in Control.[9] After receiving this notice, the Noteholders then have the option to "put" their Notes to the Company under terms set forth in the Indenture.[10]

A Change of Control is defined under the Indenture as:

(1) the acquisition by any Person ... of beneficial ownership ... through a purchase, merger or other acquisition transaction or series of transactions, of shares of capital stock of [ARC] entitling such person to exercise 50% or more of the total voting power of all shares of capital stock of [ARC] ... or (2) any consolidation of [ARC] with, or merger of [ARC] into, any other Person, any merger of another Person into [ARC], or any conveyance, sale, transfer or lease of all or substantially all of the assets of [ARC] to another person.

There is no question that the ARC/Cogent merger meets this aspect of the definition. The Indenture, however, goes on to exclude from the definition of Change in Control any merger in which the consideration paid to ARC stockholders "consists of shares of common stock traded on a national securities exchange ... or [that] will be so traded ... immediately following the Merger or consolidation ..." if the Notes become convertible "solely into *such*

---

5. Ex. A, Indenture § 5.1(7).

6. Ex. A, Indenture § 10.1.

7. Ex. A, Indenture § 10.4.

8. *Id.*

9. "Unless the Company shall have theretofore called for redemption all of the Outstanding Securities, on or before the 45th day after the occurrence of a Change in Control, the Company or, at the request and expense of the Company on or before the 15th day after such occurrence, the Trustee, shall give to all Holders of Securities, in the manner provided in Section 1.6, notice (the "Company Notice") of the occurrence of the Change in Control and of the repurchase right set forth herein arising as a result thereof and the Company shall issue a press release including the information required to be included in such Company Notice hereunder." Ex. A, Indenture § 14.3.

10. "In the event that a Change in Control ... shall occur, then each Holder shall have the right, at the Holder's option ... to require the Company to repurchase, and upon the exercise of such right the Company shall repurchase, all of such Holder's Securities not theretofore called for redemption .... on the date (the "Repurchase Date") that is 45 days after the date of the Company Notice ... at a purchase price equal to 100% of the principal amount of the Securities to be repurchased plus interest accrued to the Repurchase Date." Ex. D, Indenture § 14.1.

*common stock."* [11] The plaintiffs claim that the Merger did not meet the terms of this exclusion. If they are correct, they currently have the right to "put" their shares to the Company at par value plus accrued interest. As will be discussed later in this opinion, the issue comes down to the proper construction of the phrase "such common stock."

On October 16, 2001, Cogent (then a privately held firm) filed a registration statement with the SEC on Form S–4 in order to register its shares of common stock pursuant to the Securities Act of 1933. Cogent's Form S–4 was declared effective on January 8, 2002. Also, on December 31, 2001, Cogent filed with the AMEX an application to list 16,077,052 shares of its common stock for public trading. The AMEX approved Cogent's listing application on January 25, 2002. Included among the shares covered by the application were both the shares issuable to Cogent common stockholders in the Merger and shares issuable upon conversion of the Notes following the Merger. On February 5, 2002, Cogent issued, as consideration in the Merger, shares of its common stock to the former holders of ARC common stock. Both the AMEX listing agreement and an effective SEC registration statement covered all of the shares issued in connection with the Merger.

Before the effective date of the Merger, Cogent also filed a registration statement on Form S–1 to cover the shares issuable to Noteholders upon conversion of their Notes after the Merger. Due to various delays encountered in processing it, the Form S–1 did not become effective until July 5, 2002.

Between February 6 and 11, 2002, three of the named plaintiffs each elected to convert $1,000 face amount of their Notes into shares of Cogent common stock. Each converting Noteholder received only three shares of Cogent stock–then trading for between $3.10 and $3.27 per share–in exchange for its $1,000 of Notes. The share certificates issued to these Noteholders bear a restrictive legend stating that the shares cannot be sold, unless the shares are covered by an effective registration statement, or pursuant to an exemption from registration applicable to such sale. In all respects other than the restrictive legend, the shares of common stock issued to the Noteholders are the same type and kind as those received by ARC common stockholders in the Merger.

### III.

The plaintiffs argue that the events following ARC's merger on February 4, 2002 with and into a wholly owned subsidiary of Cogent constituted a Change in Control under the Indenture. According to this argument, in order for defendants to meet the exception to the definition of a Change in Control under the Indenture, the conversion shares had to have been subject to an effective registration statement with the SEC at the time of, or immediately after, the Merger. As a consequence of not being registered, plaintiffs contend, Cogent common stock issuable on conversion of the Notes could not be "traded" on the AMEX or any other national securities exchange, or quoted on the NASDAQ National Market System, immediately following the Merger. Therefore, they say, the Notes did not become convertible "solely into such common stock," within the meaning of the Indenture.

Defendants have the burden of proving that the Merger fits into one of the exceptions to the definition of a Change in Con-

**11.** Ex. A, Indenture § 14.4(2) (emphasis added).

trol under the Indenture.[12] Defendants argue that the exception has been met since all of the consideration for Cogent's acquisition of ARC was the common stock of Cogent, which was at the time of the Merger, and continues to be, traded on the AMEX. Thus, ARC's common stockholders received shares in Cogent that were "traded on a national securities exchange." In addition, the defendants argue, the Notes were convertible "solely into such common stock," within the meaning of the Indenture. Under the defendants' interpretation of the Indenture, the requirement that Notes be convertible "solely into such common stock" is met in either of two ways. First, it is satisfied because the Notes were convertible solely into shares of Cogent common stock of the same class and kind as that issued to ARC common stockholders. Second, defendants argue that the Merger fits within the exception even if the Indenture is read to require that the conversion shares themselves be "traded on a national securities exchange." This is so, they argue, because the absence of an effective registration statement covering the conversion shares prior to July 5, 2002 did not prevent those shares from being traded on the AMEX pursuant to an exemption from registration.[13]

## IV.

Pursuant to Court of Chancery Rule 56, a motion for summary judgment should be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.[14] In deciding a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party and the movant has the burden of demonstrating that there is no material question of fact.[15] Both parties in this case have stipulated that there are no questions of fact as to the proper interpretation of the contract terms. The plaintiffs and the defendants agree that additional discovery is unnecessary to resolve their dispute, and that a trial is not necessary to interpret the contract.

■ ■ New York law governs the Indenture and the Supplemental Indenture.[16] Under New York law, "[i]nterpretation of indenture provisions is a matter of basic contract law."[17] "[T]he initial interpretation of a contract is a matter of law for the court to decide."[18] Part of the initial interpretation is the threshold question of whether the terms of the contract are ambiguous.[19] A contract is unambiguous if it

---

**12.** The burden on the defendants to show that an *exception* to a Change in Control under the Indenture has been met is analogous to the burden that an insurer generally has to prove that an exception to an insurance clause has been met. *See Sachs v. American Central Ins. Co.,* 34 Misc.2d 687, 230 N.Y.S.2d 126 (N.Y.Sup.Ct.1962).

**13.** Defendants make a final argument that under New York law the claimed default is too inconsequential to justify the relief sought in the complaint. The court does not reach this issue, since the cross-motions are decided on other grounds.

**14.** *See, e.g., Williams v. Geier,* 671 A.2d 1368, 1375 (Del.1996).

**15.** *Tanzer v. International General Industries, Inc.,* 402 A.2d 382, 385 (Del.Ch.1979) (citing *Judah v. Delaware Trust Co.,* 378 A.2d 624, 632 (Del.1977)).

**16.** Ex. A, Indenture § 1.11

**17.** *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1050 (2d Cir. 1982).

**18.** *K. Bell & Assocs., Inc. v. Lloyd's Underwriters,* 97 F.3d 632, 637 (2d Cir.1996).

**19.** *First Lincoln Holdings, Inc. v. Equitable Life Assurance Society of the United States,* 164 F.Supp.2d 383, 393 (S.D.N.Y.2001).

"has a definite and precise meaning, unattended by danger of misconception" in the purpose of the agreement and "concerning which there is no reasonable basis for a difference of opinion."[20] If a contract is unambiguous, the court is required to give effect to it as written and cannot consider extrinsic evidence of its meaning.[21] Contract language whose meaning is plain is not ambiguous simply because the parties have different interpretations.[22]

## V.

■ The language at issue is found in Section 14.4(2) of the Indenture. In accordance with that provision, the Merger will be deemed to result in a Change of Control of ARC unless:

all of the consideration (excluding cash payments for fractional shares and cash payments made pursuant to dissenters' appraisal rights) in [the Merger] consists of shares of common stock traded on a national securities exchange or quoted on the NASDAQ National Market (or will be so traded or quoted immediately following [the Merger]) and as a result of [the Merger] the notes become convertible solely into such common stock.[23]

Parsing this language discloses two interrelated elements that must be satisfied for the Merger to qualify for the exception. First, all of the consideration paid to ARC stockholders in the Merger (other than as excluded by the text) needed to consist of shares of common stock in Cogent that were either traded on a national securities exchange, such as the AMEX, or quoted on the NASDAQ National Market System. Second, if the first requirement was met, then as a result of the Merger the Notes needed to become convertible "solely into such common stock."

There is no disagreement that the first element of this exception was met. The consideration paid in the Merger (with permitted exceptions) all took the form of Cogent common stock. Moreover, at the effective time of the Merger, the Cogent shares issued in exchange for the ARC common stock were registered with the SEC and covered by a valid listing agreement with the AMEX. They were, unquestionably, "traded on a national securities exchange."[24]

There is also no disagreement that, as a result of the Merger, the Notes became convertible solely into shares of the same class of common stock issued to the ARC stockholders in the Merger. All those shares were in every respect identical under Delaware law. For these reasons, if the second element of the exception found in Section 14.4(2) requires only that Notes become convertible into shares of the same class of common stock as the shares issued to the stockholders in the Merger, there is no real dispute that this element of the exception also was met.

Of course, the plaintiffs reject this reading of the exception. They urge the court to read the phrase "such common stock" found in Section 14.4(2) as requiring that the shares issuable upon conversion of the

---

20. *Id.* at 393 (internal citations omitted).

21. *Id.* at 393.

22. *Id.*

23. Ex. A, Indenture § 14.4(2).

24. This conclusion is buttressed by Exhibit K to the Affidavit of Thad J. Bracegirdle, submitted in support of the defendants' position, which is a chart summarizing the history of trading in Cogent shares beginning on February 5, 2002. This shows that Cogent common stock was traded on the AMEX, although not in a large volume, starting immediately after the effective time of the Merger.

Notes themselves be "traded on a national securities exchange or quoted on the NAS-DAQ National Market" at or immediately after the Merger. Because the registration statement with respect to the conversion shares was not effective until five months after the Merger, the argument goes, those shares were not and could not have been so "traded" at the necessary time. Thus, they say, the Merger constituted a Change of Control.

Reading the Indenture as a whole, and considering the operation of the contemporaneously executed Registration Rights Agreement, the court concludes that the language at issue is both unambiguous and fatally inconsistent with the plaintiffs' position. The reasons for this are as follows.

The word "such" in the phrase "such common stock" is best read as referring only to the type or kind of common stock issued to the ARC stockholders in a merger; in this case, Cogent common stock. As discussed by an expert in modern legal usage, when it is used "to modify a singular noun, *such* typifies LEGALESE as much as *aforesaid* and *same*.... Contrary to what some think, *such* is no more precise than *the, that,* or *those.*"[25] In this case, if the phrase in question appeared instead as "the common stock," or, in legalese, "the aforesaid common stock," or "the same common stock," there is no question that the exception found in Section 14.4(2) would be satisfied because, as a result of the Merger, the Notes become convertible into shares of the *common stock* issued to ARC stockholders in the Merger.

The plaintiffs' argument, by contrast, would stretch the word "such" far beyond its meager demonstrative powers. That argument would require the court to read the word "such" to include the requirement that the antecedent "shares of common stock" also be "traded on a national securities exchange." By the logic of this argument, the meaning of the word "such" comes to include not only the common stock itself but also the registration of those shares with the SEC and their listing on the AMEX. Generally speaking, whether shares of stock "trade" on a national securities exchange or are registered with the SEC does not depend on any legal quality or characteristic of the shares themselves. Rather, the ability to "trade" on an exchange depends on the existence of a listing agreement between the issuer and the exchange and the presence of an effective SEC registration statement covering those shares.[26] Because these conditions do not inhere in the stock itself, the court will not interpret the phrase "such common stock" to include a reference to them.

This conclusion is fully consistent with the apparent purpose of Section 14.4(2), which was to permit mergers that preserved the value of the conversion feature of the Notes. As already discussed, the Indenture (as opposed to the Registration Rights Agreement) did not require ARC to register either the Notes or the conversion shares. ARC common stock, by contrast, was publicly traded. If, as the result of a merger, the holders of ARC common stock receive exclusively shares of some other publicly traded common stock, the value of the conversion feature of the Notes is preserved so long as, after that merger, the Notes become convertible solely into shares of that same common stock. Thus, it would be unusual and inconsistent with the overall structure of the Indenture to

---

**25.** Bryan A. Garner, *A Dictionary of Modern Legal Usage* (2d ed.) at 849 (emphasis in original).

**26.** Of course, other factors, such as the status of the holder as an insider or the manner in which the shares were acquired, may also affect a holder's ability to trade those shares on an exchange.

read the phrase "such common stock" in Section 14.4(2) to contain an unexpressed requirement that the shares issuable upon conversion after a merger be registered with the SEC or traded on an exchange.[27]

Additionally, the court notes that the plaintiffs' reading of Section 14.4(2) renders that section unworkable and meaningless as a practical matter. There is a simple reason for this. At the time ARC and Cogent agreed to the Merger, there were *no* "conversion shares." Moreover, there surely was no expectation that any Noteholder would exercise the right to convert, either before or immediately after the Merger, because the conversion feature was far "out of the money."[28] In the circumstances, when planning to meet the exception to the definition of Change of Control in the Indenture, ARC and Cogent could never have guaranteed that the conversion shares would be "traded" at or immediately after the effective time of the Merger *because there were no shares to trade.*[29] Merely registering unissued shares

with the SEC (as the plaintiffs suggest was required) would not have made a difference. Whether registered or not, unissued shares do not trade.[30]

The foregoing reasons lead the court to conclude that the Merger satisfied the exception to the definition of a Change of Control within the meaning of Section 14.4(2) of the Indenture. Thus, the Noteholders do not, at least for that reason, currently have any right to demand that ARC or Cogent repurchase their Notes at face value.

## VI.

For the above reasons, the plaintiffs' motion for partial summary judgment shall be and hereby is DENIED, and the defendants' cross-motion for partial summary judgment shall be and hereby is GRANTED. IT IS SO ORDERED.

27. The parties spend considerable energy arguing over whether the few conversion shares that were issued in legended form could have been "traded" on the AMEX before the S–1 registration statement became effective on July 5, 2002. This question appears to turn on difficult, if not to say arcane, points of law under the Securities Act of 1933. It is unnecessary to reach these issues because the court disposes of the motions on other grounds. It should be noted, however, that the very complexity of the issues relating to whether the conversion shares could have been "traded" in the absence of an effective registration statement reinforces the correctness of the court's conclusion that the Indenture is better interpreted in a manner that does not implicate those issues.

28. The conversion rate of the Notes is 2.09 shares of Cogent common stock for each $1,000 face amount. In recent months, the Notes have sold in the range of $250 per $1,000 face amount. Cogent common stock now trades for less than $1 per share and, at the time of the Merger, traded for approxi-

mately $5 per share. Thus, it would cost a Noteholder approximately $120 to acquire less than $1 worth of common stock.

29. Indeed, it is only because three of the named plaintiffs made the economically unjustified decision to convert a small fraction of their Notes into a mere handful of shares of Cogent common stock that there are *any* conversion shares at all to consider. Clearly, the existence of those shares cannot be material to the outcome of these motions. The meaning of the Indenture cannot vary depending on whether or not Notes are converted.

30. Nor is this situation unusual or outside normal expectations relating to issuances of convertible securities. Although the parties have not addressed this issue, the court is aware that, as a general matter, holders of convertible securities have no economic incentive to tender them for conversion unless a failure to do so will result in a destruction or diminution of the conversion feature of the instrument.