864 A.2d 930 (2004)
U.S. BANK NATIONAL ASSOCIATION, in its capacity as Indenture Trustee and not in its individual capacity, Plaintiff,
v.
U.S. TIMBERLANDS KLAMATH FALLS, L.L.C., n/k/a Inland Fiber Group, L.L.C.; U.S. Timberlands Finance Corp. n/k/a Fiber Finance Corp., U.S. Timberlands Yakima, L.L.C., n/k/a American Forest Resources, L.L.C.; U.S. Timberlands Holdings Group, L.L.C. n/k/a Cascades Resource Holdings Group, L.L.C.; U.S. Timberlands Services Company, L.L.C., n/k/a Timber Resources Services, L.L.C.; John M. Rudey; Alan B. Abramson; Aubrey L. Cole; George R. Hornig; Robert F. Wright; and William A. Wyman, Defendants.
No. C.A. No. 112-N.
Court of Chancery of Delaware, New Castle County.
Submitted: December 6, 2004.
Decided: December 22, 2004.
*934 Daniel B. Rath, Esquire, Rebecca L. Butcher, Esquire, Landis Rath & Cobb LLP, Wilmington, Delaware; Jerome A. Miranowski, Esquire, Kerry L. Bundy, Esquire, Nathaniel Zylstra, Esquire, Faegre & Benson LLP, Minneapolis, Minnesota, Attorneys for the Plaintiff.
Bruce L. Silverstein, Esquire, C. Barr Flinn, Esquire, Karen E. Keller, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; David M. Friedman, Esquire, Mark P. Ressler, Esquire, R. Tali Epstein, Esquire, Kasowitz, Benson, Torres & Friedman, LLP, New York, New York, Attorneys for Defendants U.S. Timberlands Klamath Falls, L.L.C., n/k/a Inland Fiber Group, L.L.C., and U.S. Timberlands Finance Corp., n/k/a Fiber Finance Corp.
Bruce L. Silverstein, Esquire, C. Barr Flinn, Esquire, Karen E. Keller, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, Attorneys for Defendants U.S. Timberlands Yakima, L.L.C., n/k/a American Forest Resources, L.L.C., U.S. Timberlands Holdings Group, L.L.C., n/k/a Cascades Resource Holding, L.L.C., U.S. Timberlands Services Company, L.L.C., n/k/a Timber Resources Services, L.L.C., John M. Rudey, and George R. Hornig.
Jesse A. Finkelstein, Esquire, Srinivas M. Raju, Esquire, Richards, Layton & Finger, Wilmington, Delaware, Attorneys for Defendants Alan B. Abramson, Aubrey L. Cole, Robert F. Wright, and William A. Wyman.

OPINION
LAMB, Vice Chancellor.

I.
This action arises from a suit by an indenture trustee seeking a declaration that the issuer violated several provisions of the indenture by entering into transactions with a related third-party. The trustee alleges that these transactions were completed to the detriment of the issuer, and for the benefit and personal gain of the defendants. The trustee further alleges breach of fiduciary duty, actual and constructive fraud, and seeks the avoidance of certain transactions between the issuer and the related entity and the imposition of a constructive trust on the property that was the subject of those transactions.
The trustee has moved for partial summary judgment. It argues that it has introduced evidence of a prima facie case that certain transfers by the defendants violate the indenture, and that the defendants have failed to rebut its prima facie case. The defendants cross-moved to dismiss for failure to state a claim upon which relief can be granted. They argue that the complaint fails to allege facts sufficient to bring a cause of action and, in the alternative, the claims raised are barred as a matter of law.
The court holds that the well-pleaded allegations in the complaint state a claim for relief, and that the trustee's action is *935 not barred as a matter of law. The court also holds that the trustee is entitled to partial summary judgment declaring that an Event of Default exists under the indenture regarding certain related party transactions occurring between 1999 and 2001. The defendants' motion for judgment on the pleadings will be denied and the trustee's motion for partial summary judgment will be granted.

II.[1]

A. The Parties

U.S. Bank National Association, the plaintiff indenture trustee ("Trustee"), is a nationally chartered banking association with its executive offices in Minneapolis, Minnesota.[2]
Defendant U.S. Timberlands Klamath Falls, L.L.C. ("Klamath" or the "Issuer") is a Delaware limited liability company with its principal place of business in Klamath Falls, Oregon.[3] Klamath is in the timber business. The manager of Klamath is defendant U.S. Timberlands Services Company, L.L.C. ("Services"),[4] a Delaware limited liability company. Defendant U.S. Timberlands Finance Corp. ("Finance"),[5] a Delaware corporation, is a wholly owned subsidiary of Klamath and was also an issuer of the notes. Defendant U.S. Timberlands Holdings Group, L.L.C. ("Holdings"),[6] and defendant U.S. Timberlands Yakima L.L.C. ("Yakima")[7] are both Delaware limited liability companies. Yakima is also in the timber business.
Additionally, the five members of the board of directors of Services are named as individual defendants: John M. Rudey,[8] Alan B. Abramson, Aubrey L. Cole, George R. Hornig, Robert F. Wright, and William A. Wyman.[9]

B. Background

In 1996, Rudey formed Klamath for the purpose of growing and selling timber to third parties. On November 17, 1997, Klamath issued $225 million in unsecured notes pursuant to an indenture (the "Indenture") for which U.S. Bank serves as indenture trustee. In 1999, Rudey formed Yakima, a company with essentially the same business as Klamath. According to the complaint, Yakima and Klamath are under the direct or indirect common control of Rudey.[10]
*936 The Trustee filed its complaint on December 12, 2003 and its amended complaint on April 16, 2004.[11] On July 29, 2004, this court dismissed the amended complaint without prejudice for lack of standing, with leave to amend. On August 30, 2004, the Trustee filed the Second Amended Complaint (hereinafter, the "Complaint").
Generally, the Complaint challenges two sets of transactions between Klamath and Yakima. First, the Complaint challenges a series of contributions of timberlands by Klamath to Yakima in exchange for "preferred" interests in Yakima that took place in October 1999, February 2001, June 2001, December 2002, and February 2003. In return for transferring timberlands valued at approximately $61.9 million, Klamath received equity with a "guaranteed" cumulative annual return, and a 51% voting interest in Yakima, that was later abrogated by Rudey.[12] The "guaranteed" return has never been paid and, as of December 31, 2002, Yakima owed the Issuer $5,020,000 on this return. After each of the transfers, Yakima immediately borrowed against the timberlands, and placed liens on them, allegedly in violation of the Indenture. Those timberlands remain subject to liens in favor of Yakima's creditors.
Second, the Complaint attacks sales of timberlands by Klamath to Yakima for cash between December 2001 and May 2003. The Complaint alleges that the Issuer took no profits from these sales. Instead, the Issuer agreed to take any profits only when Yakima sold the timberlands, and then only as an adjustment to the Issuer's equity interest in Yakima. These transactions, the Complaint alleges, were not on arm's-length terms and, therefore, violated section 4.11 of the Indenture.
Among other things, the Complaint alleges that Rudey and other individual defendants used the assets transferred from Klamath to Yakima to settle lawsuits brought against them and to finance a going private transaction involving the Partnership. In addition, the Complaint alleges that the Issuer made the November 2003 semi-annual interest payment in December 2003 (although within the 30-day grace period) and only after liquidating assets to raise the cash. The Complaint does not otherwise allege that the Issuer has failed to make a payment of interest or principal on the notes. Furthermore, the Complaint alleges that the transfers have left the Issuer's liability greatly in excess of its assets.[13]
On May 17, 2004, the Trustee sent a written notice of default to the Issuer and Finance, detailing the timberland transfers *937 outlined above, and claiming that they violated sections 4.8, 4.9, 4.10, and 4.11 of the Indenture. The notice required the Issuer to cure the defaults. The Issuer's response denied the existence of any default.
By August 27, 2004, 24 noteholders (or their authorized representative) holding $126,917,000 in principal amount of the outstanding notes, representing more than 55% of the outstanding principal amount, informed the Trustee, in writing, of their belief of the existence of a continuing Event of Default under the Indenture and requested that the Trustee pursue all available remedies.[14] The Trustee did not require indemnification with respect to these requests, since it determined that the suit was in the best interest of all the noteholders, ratably.
The Complaint has six counts. Count I is asserted against Klamath and seeks a declaratory judgment that the transactions at issue violated the Indenture. Count II alleges breach of fiduciary duty by the Individual Defendants for approving the contributions of timberlands in exchange for preferred interests. Counts III and IV are asserted against all the defendants and seek the avoidance of the transfers, a constructive trust over the timberlands transferred to Yakima, and damages on the grounds that the transfers are fraudulent conveyances under the Uniform Fraudulent Transfer Act adopted by both Delaware and Oregon, and New York Debtor & Creditor Law.[15] Counts III and IV are based, respectively, on the theories of actual and constructive fraud. Count V is asserted against Klamath and seeks injunctive relief against further transfers by Klamath to Yakima or other related entities. Count VI is asserted against Klamath and Finance for breach of the Indenture.
On October 8, 2004, the Trustee moved for partial summary judgment pursuant to Court of Chancery Rule 56, seeking a determination that the Issuer is in default of the Indenture with respect to the $40.5 million in transfers made from Klamath to Yakima before September 14, 2001, the date on which Rudey allegedly stripped Klamath of its voting rights in Yakima. On October 15, 2004, the defendants moved to dismiss the Complaint pursuant to Court of Chancery Rule 12(b)(6). The court will deal first with the motion to dismiss.

III.
The standard for dismissal pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted is well established. The motion will be granted if it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleading.[16] In considering a motion to dismiss under Rule 12(b)(6), the court is required to assume the truthfulness of all well-pleaded allegations of fact in the complaint.[17] All facts of the pleadings and inferences that can reasonably be drawn therefrom are accepted as true.[18] However, neither inferences nor conclusions of fact unsupported by allegations of specific *938 facts are accepted as true.[19] That is, a trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in the plaintiffs' favor unless the inferences are reasonable.[20]
The defendants make several arguments for dismissal of the Complaint. First, they contend that the Complaint must be dismissed because the Trustee cannot satisfy the condition precedent for commencing an action under the Indenture. Second, the defendants claim that the non-contractual claims should be dismissed because the Trustee lacks standing to bring these claims. Third, the defendants claim that the Complaint should be dismissed because the alleged facts do not establish a breach of the Indenture. Fourth, the defendants claim that the allegations of a breach of fiduciary duties must be dismissed because the Complaint fails adequately to allege that the defendants owed fiduciary duties to the noteholders. Fifth, the defendants contend that the claims for breach of fiduciary duty must be dismissed because a particular provision in the Klamath Agreement deems the transfers not to constitute a breach of any duty. Sixth, the defendants argue that the claims for breach of fiduciary duty and fraudulent conveyance must be dismissed because the prospectus for the notes specifically informed the noteholders that the defendants could engage in the transactions at issue. Seventh, the defendants argue that the claims against the individual defendants, and certain entity defendants, should be dismissed because they are barred by the Indenture. Finally, the defendants aver that the Complaint is barred by equitable estoppel and laches. The court will address these arguments in turn.

A. Can The Trustee Satisfy The Condition Precedent For Commencing An Action Under The Trust Indenture?

The defendants argue that this lawsuit was brought before the cause of action had accrued and should, therefore, be dismissed.
In an earlier related opinion,[21] the court dismissed the first amended complaint without prejudice and with leave to re-file, finding that the Trustee had not adequately alleged grounds establishing its standing to maintain the action. That opinion noted that "the Indenture makes the Trustee's authority to sue dependent upon the giving of notice of a default and passage of the 60-day cure period."[22] Since the Trustee had not given the required notice before filing, this court dismissed, but did so without prejudice.[23]
In the Complaint now before the court, the Trustee alleges, and the defendants do not contest, that the Trustee gave notice of default on May 17, 2004. The Complaint was filed on August 30, 2004, more than 60 days after the notice of default. Therefore, the Trustee has authority to sue.
In opposition to this reasoning, the defendants rely upon this court's decision in Elliott Assoc. v. Bio-Response, Inc.[24] to argue that the Trustee's lack of standing is a jurisdictional defect that cannot be *939 remedied.[25] The defendants mistakenly rely on Elliott for this proposition.
In Elliott, the court dismissed a suit brought by certain debenture holders. Under the terms of the indenture there at issue, the debenture holders had the right, exercisable after a fixed date, to require the issuer to redeem the debentures at approximately 103 of the face amount together with accrued interest (the "put option"). One year before the exercise date of the put option, the issuer released a statement relating that the issuer might not have sufficient funds to satisfy that contingent redemption obligation. The debenture holders brought suit and the court dismissed with prejudice because there was no default alleged under the indenture.
Elliott is very different from this case. Elliott involved a situation in which the plaintiffs had not only failed to allege an "event of default," but they had also failed to allege a "default" at all.[26] This is not just a semantic distinction. In essence, the plaintiff in Elliott had failed to allege that the issuer had breached the indenture. Obviously, dismissal of a suit that was based on a violation of the indenture, when no violation of the indenture had been alleged, was proper under the circumstances. In this case, however, the Trustee has alleged that the defendants violated the Indenture in connection with the transfer of assets to Yakima, i.e. that the defendants are in default.[27] Because the Trustee at first failed to allege compliance with the technical notice provisions of the Indenture, this court dismissed with leave to amend. Since the Trustee now alleges compliance with the Indenture, it has standing to bring this suit.

B. Does The Trustee Lack Standing To Bring The Non-Contractual Claims?

The defendants contend that the non-contractual claims should be dismissed because the Trustee lacks standing to bring these claims.
An indenture trustee derives its powers and rights from the indenture itself,[28] and those powers are specifically *940 limited to those given to it through the terms of the indenture.[29] The general duties of the Trustee are defined in section 7.1 of the Indenture, providing, in relevant part, as follows:
If an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.
The specific powers of the Trustee to sue the Issuer are also spelled out in the Indenture. Section 6.3 of the Indenture states as follows:
If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy (under this Indenture or otherwise) to collect the payment of principal or interest on the Notes or to enforce the performance of any provision of the Notes, or this Indenture.
The defendants argue that the Trustee has not alleged that they are in default on payments on the notes. Therefore, the Trustee's non-contractual claims are not asserted "to collect the payment of principal or interest on the Notes." Furthermore, since these claims are non-contractual, they do not, by definition, "enforce the performance of any provision of the Notes, or [the] Indenture." Therefore, the argument goes, the Trustee lacks standing to bring these claims. The court disagrees.
The position advanced by the defendants would lead to an absurd result. Delaware courts, applying New York law, have held that "no-action" clauses contained in an indenture, substantially the same as section 6.6 of the Indenture (which is also governed by New York law), bar noteholders from bringing non-contractual claims without first complying with the demand requirement spelled out therein.[30] The no-action clause of the Indenture requires that noteholders seeking to pursue a remedy "with respect to this Indenture or the Notes" must first give written notice to the Trustee of a continuing Event of Default and afford the Trustee a reasonable opportunity to exercise its powers under the Indenture or to sue for the enforcement of the Indenture.[31] Former Chancellor Allen *941 comprehensively elucidated the legal rationale governing enforcement of no-action clauses:
The major purpose of [no-action clauses] is to deter individual debentureholders from bringing independent law suits for unworthy or unjustifiable reasons, causing expense to the Company and diminishing its assets. The theory is that if the suit is worthwhile, [a significant percent] of the debentureholders would be willing to join in sponsoring it.... An additional purpose is the expression of the principle of law that would otherwise be implied that all rights and remedies of the indenture are for the equal and ratable benefit of all holders.[32]
Chancellor Allen went on to explain that:
[t]he primary purpose of a no-action clause is thus to protect issuers from the expense involved in defending lawsuits that are either frivolous or otherwise not in the economic interest of the corporation and its creditors. In protecting the issuer such clauses protect bondholders. They protect against the exercise of poor judgment by a single bondholder or a small group of bondholders, who might otherwise bring a suit against the issuer that most bondholders would consider not to be in their collective economic interest. In addition to providing protection against improvident litigation decisions, a no-action clause also protects against the risk of strike suits. Obviously the class features of any such suits make that prospect somewhat more likely and somewhat more risky to the issuer than it would otherwise be.
No-action clauses address these twin problems by delegating the right to bring a suit enforcing rights of bondholders to the trustee, or to the holders of a substantial amount of bonds, and by delegating to the trustee the right to prosecute such a suit in the first instance. These clauses also ensure that the proceeds of any litigation actually prosecuted will be shared ratably by all bondholders.[33]
As a necessary corollary to holding that the noteholders were unable to bring non-contractual claims, the former Chancellor held that these claims could be brought by the indenture trustee, once demand had properly been made. "Given the derivative character of these claims, it is clear that they can be prosecuted by the trustees representing the bondholders as a group, provided the trustees are in a position in which they can represent plaintiffs fairly."[34] To have held otherwise would have been to place the debentureholders in a Catch-22. If they brought the non-contractual claims on their own behalf, then the claims would be barred by the no-action clause. If they followed the requirements of the no-action clause and the Trustee agreed to bring suit, then the claims would be dismissed for lack of standing.
In light of the clear holding in Feldbaum, it is more sensible to read sections 6.3 and 6.6 of the Indenture in concert. *942 Since section 6.6 requires noteholders seeking to assert non-contractual claims to make demand upon the Trustee, that section must implicitly recognize the power of the Trustee to bring the claims, in response to a properly made demand even where the Trustee would lack that power under section 6.3 without a demand. Since demand was made in accordance with section 6.6, the Trustee has the power to bring the non-contractual claims.
The defendants cite several non-Delaware authorities holding that language substantially the same as that contained in section 6.3 is insufficient to give an indenture trustee standing to sue on a non-contractual claim. For example, in Regions Bank, the District Court in Illinois held that a clause providing that the Trustee "may pursue any available remedy... to collect the principal of, premium, if any, or interest on the Bonds or to enforce the performance of any provision of the Bonds, this Indenture" was insufficient to give the trustee standing to assert a non-contractual claim.[35] The reasoning underlying this decision is that while, due to the no-action clause, the noteholders surrendered their right to sue independently to recover under the indenture, they had not surrendered their right to sue independently on non-contractual claims.[36] Therefore, the court in Regions Bank was unwilling to read an additional term into the trust indenture that divested the noteholders of this right without clear language to do so.[37]
This reasoning depends, however, on the noteholders' ability to bring the non-contractual claims on their own behalf, without regard to the no-action clause. In Regions Bank, the court specifically held that, while the indenture trustee could not bring the non-contractual claims because it was not given such authority by the indenture, the noteholders could bring such claims.[38] Therefore, the court in that case specifically rejected placing the bondholders in the Catch-22 espoused by the defendants. While this court is reluctant to interpret the provisions of a trust indenture differently from another court interpreting substantially the same provision, to do otherwise would require the court either to drastically restrict the scope of the no-action clause, as interpreted in prior decisions of this court, or render the operation of that clause absurd. Therefore, the court must hold that the Trustee has standing to bring the non-contractual claims.[39]

*943 C. Does The Complaint Allege Facts Sufficient To Establish A Breach Of The Indenture?

The defendants argue, in any case, that the facts alleged in the Complaint do not establish a breach of the Indenture. This is so, they contend, because sections 4.8 and 4.10 only apply to transfers to a "Subsidiary," as that term is defined by the Indenture, and were not violated because Yakima is not a "Subsidiary" of Klamath. Furthermore, the defendants argue that the transfers, because they fall within the limits of other provisions the Indenture, also did not violate section 4.11 of the Indenture. Each of these contentions will be addressed in turn.

1. Is Yakima A Subsidiary Of Klamath?

Section 4.8 of the Indenture precludes the Issuer, and any of its "Restricted Subsidiaries," from incurring additional debt unless their earnings are more than sufficient to service their debt.[40] Section 4.10 of the Indenture precludes the Issuer, and any of its "Restricted Subsidiaries," from creating any liens on the properties or assets of the company.[41] The defendants do not dispute that, if Yakima is a Subsidiary, then sections 4.8 and 4.10 of the Indenture were, at least initially, violated.[42] Therefore, the issue before the court is whether Yakima is a Subsidiary.
The Indenture defines a Subsidiary:

*944 "Subsidiary" means, with respect to any Person, (a) a corporation a majority of whose Voting Stock (or, in the case of a partnership, a majority of the partners' Capital Stock, considering all partners' Capital Stock as a single class) is at the time, directly or indirectly, owned by such Person, by one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries thereof and (b) any other Person, including, without limitation, a joint venture, in which such Person, one or more Subsidiaries thereof or such Person and one or more Subsidiaries thereof, directly or indirectly, at the date of determination thereof, has at least majority ownership interest entitled to vote in the election of directors, managers, general partners or trustees thereof (or other Person performing similar functions) or, if such Persons are not elected, to vote on any matter that is submitted to the vote of all Persons holding ownership interests in such entity. For purposes of this definition, any directors' qualifying shares or investments by foreign nationals mandated by applicable law shall be disregarded in determining the ownership of a Subsidiary. (Emphasis added).
Because Yakima is not a corporation or a partnership, subsection (b) is applicable. From subsection (b), if the Issuer has at least a majority ownership interest in Yakima entitling it to vote in the election of directors, managers or other similar persons of Yakima, it is a Subsidiary.
Yakima's Operating Agreement, dated September 28, 1999 (the "Original Operating Agreement") defines the Issuer as: "U.S. Timberlands Klamath Falls, L.L.C., a Delaware limited liability company possessing 51% of the Voting Interests of the Company [Yakima]." The Indenture defines "Voting Interests" as "the proportion in which voting rights are shared among the Members." Under the Original Operating Agreement, the Issuer, along with Holdings and the Partnership, are defined as Yakima's "Initial Members." Under section 10.4 of the Original Operating Agreement, the appointment of new or additional managers was effectuated through a vote of Members owning a "Supermajority" (i.e. 80%) of the Voting Interest. Additionally, pursuant to section 10.4, the Manager of Yakima could be removed by a vote of Members owning a Supermajority of the Voting Interest. Therefore, the Issuer had a 51% voting interest in the appointment of new or additional managers and the removal of the current manager.
The defendants contend that this interest did not constitute a "majority ownership interest entitled to vote in the election of directors, managers, [etc.]" because Klamath could not control the outcome of these elections. [43] They argue that, read in the entire context of the Indenture, sections *945 4.8 and 4.10 require that the Issuer be able to control the outcome of any such vote. This is so because, if not, the Issuer would be required to satisfy other provisions of the Indenture, such as precluding a subsidiary from incurring liens as required by section 4.10, but would lack the requisite control to do so.
The court cannot accept this reasoning. New York law governs the Indenture in this case, and under New York law "[i]nterpretation of indenture provisions is a matter of basic contract law." [44] If a contract is unambiguous, a court is required to give effect to its unambiguous terms. [45] The Indenture plainly states that an entity is a Subsidiary of the Issuer if the Issuer has a "majority ownership interest entitled to vote in the election of directors, managers [etc.]." Klamath had such a majority ownership interest. The Indenture makes no reference to a control requirement. This court will not read such a requirement into the plain language of the Indenture.
The defendants also argue that Klamath's interest in Yakima was not an "ownership" interest. They claim that Klamath only had a "preferred interest," which provided a fixed return. "Klamath was therefore no more an owner of Yakima than the Noteholders." [46] Again, the court disagrees. As outlined above, Klamath exercised substantial voting power over the operations of Yakima. Furthermore, the vast majority of Yakima's equity capital was provided by Klamath. The Complaint alleges that, at the time of Yakima's formation, Klamath contributed timberlands valued at $22 million.[47] The only other infusion of capital, a relatively modest $600,000, came from Partners and Holdings. Since Klamath provided the overwhelming majority of equity capital at Yakima's inception, Klamath plainly had an "ownership" interest.
For the above reasons, this court must conclude that Yakima was a Subsidiary of Klamath.

2. Were The Transfers Excepted From § 4.11?

The defendants argue that the transfers made by Klamath to Yakima were made with an "Affiliate" [48] such that sections 4.9 and 4.11, and not sections 4.8 and 4.10, apply. The defendants also argue that, even if the transactions made before the adoption of the Amended Operating Agreement were with a Subsidiary, the transactions made after its adoption were made with an Affiliate and subject to those provisions.[49] The defendants further contend *946 that, while section 4.11 generally prohibits transactions between Klamath and its Affiliates if the transactions are not on arm's-length terms, non-arm's-length affiliated transactions are allowed to the extent they meet the definition of "Permitted Investments." [50] This is so because, they argue, section 4.11 excludes from its coverage transactions "permitted by ... Section 4.9," and, the defendants contend, Permitted Investments are "permitted" by section 4.9.
This construction of the Indenture is untenable. Section 4.11 unambiguously places restrictions on transfers between Klamath (or its Subsidiaries) and Affiliates.[51] It requires that these transactions be made on terms no worse than those that could be obtained through arm's-length bargaining. It excludes from its regulation only transactions "permitted by" section 4.9. Section 4.9 prohibits the payment of dividends, the redemption of stock, the retirement of subordinated debt, or the making of any investments other than "Permitted Investments," unless the Issuer's financial condition meets certain exacting (and intricate) standards. For the purposes of construing section 4.11, it is transactions that meet those standards that are appropriately seen as being "permitted" by section 4.9.
The defendants would have the court interpret the "permitted by... Section 4.9 hereof" proviso found in section 4.11 as a broad escape hatch for all Permitted Investments  whether with Affiliates or not  from the regulatory provisions of section 4.11. The court rejects this interpretation of the Indenture. Permitted Investments are neither prohibited by section 4.9 nor expressly "permitted" by it. Instead, the scope of "investments" made subject to section 4.9 is simply defined to exclude "Permitted Investments." Obviously, if Klamath had intended to exempt all "Permitted Investments" from the affiliated party transaction standards found in section 4.11, it could easily and clearly have done so by referring specifically to "Permitted Investments" in the proviso to section 4.11. It did not. Instead, that proviso refers only to section 4.9 and is best understood to apply only to those transactions that are both included within the scope of transactions governed by and not prohibited by section 4.9. This conclusion is further supported by the rule requiring that documents such as trust *947 indentures that contain "an ambiguity or contradiction or apparently inconsistent provisions" be construed against the drafter.[52]
Moreover, the defendants' reading of the Indenture would seriously compromise the protections afforded to the noteholders by sections 4.9 and 4.11. The interaction of the two provisions is clear. Under section 4.11, transactions with Affiliates must be made on arm's-length terms. An exception to this general prohibition is when the company is doing well financially, as evidenced by it meeting the onerous formula set out in section 4.9. When this is the case, the company can, for example, retire subordinated debt and make additional investments. However, when the company is in a more perilous financial condition, and there is a greater risk of non-payment, the company is prevented from doing such things. To read the Indenture to allow the company to engage in Permitted Investments with Affiliates, even though they are not on arm's-length terms, and even though the company is doing poorly, would rob the noteholders of a substantial part of the protections to which they are entitled.[53] The court will not do so.

D. Does The Complaint Allege A Breach Of Fiduciary Duties?

The defendants argue that the factual allegations in the Complaint do not establish that the defendants owed a fiduciary duty to the noteholders. They rightly assert that the general rule is that the directors of a debtor company do not owe the creditors any duty beyond the relevant contractual terms.[54] Moreover, while admitting that, when the debtor is insolvent, the fiduciary duties of those managing a debtor enterprise extend to the interests of creditors,[55] the defendants argue that the Complaint does not allege sufficient facts from which the court can infer that the Issuer is insolvent.
To meet its burden to plead a breach of fiduciary duty, the Trustee must plead facts sufficient to support a finding that Klamath is or was insolvent. In Delaware, insolvency is defined in two ways. First, a company is insolvent if it is "unable to pay its debts as they fall due in the usual course of business." [56] Second, a company may be insolvent if "it has liabilities in excess of a reasonable market value of assets held." [57] In addition, directors' *948 or managers' fiduciary duties may extend to the interests of the company's creditors when the company is in the "zone of insolvency." [58] While the so-called zone of insolvency has not been clearly defined, it is clear that whether a company is within the zone can be a fact-intensive inquiry.[59]
The Complaint alleges that the Issuer failed to pay the interest due on the notes by the November 17, 2003 due date, and that the Issuer only made the payment, during the 30-day grace period, by liquidating assets.[60] The Trustee further alleges that the Issuer's liabilities so far exceed its assets as to make it unlikely that the Issuer will be able to repay the principal on the notes at maturity.
The allegation that the November 2003 payment was made late is not alone enough to support an inference of insolvency. Nevertheless, in 2007, the Issuer will have to repay the $225 million it borrowed by issuing the notes. The fact that the Issuer has been unable to make even the interest payments due under the notes on time implies, albeit weakly, that it will also be unable to repay the principal when it comes due.
The inference of insolvency is more easily drawn from the allegations of the Complaint relating to the gross disparity between Klamath's assets and liabilities. The defendants are clearly right to argue that having liabilities in excess of the book value of assets is not dispositive of the issue of whether a company is insolvent. If it were, many start-up companies would be insolvent. However, the existence of such a great disparity between assets and liabilities as alleged in the Complaint in a mature company such as Klamath at least raises an issue of material fact as to whether the company was insolvent, or in the zone of insolvency, at the time of some or all of the transactions attacked in the Complaint. This is enough to survive a motion to dismiss.

E. Are The Transfers Deemed Not To Be Breaches Of Fiduciary Duty By The Klamath Agreement?

The defendants next argue that the claims for breach of fiduciary duty must be dismissed because the Klamath Operating Agreement deems the transfers not to constitute a breach of any duty. This is because, the defendants contend, any fiduciary duty claims the Trustee might bring are *949 derivative, and must, therefore, be brought on behalf of the partnership. The defendants also claim that the Klamath Operating Agreement deems the challenged transactions to be "fair and reasonable" and not a "breach of any duty." This is because the transaction was allegedly approved by a majority of the directors who comprise Klamath's Conflicts Committee.
Section 7.6(e) of the Second Amended and Restated Operating Agreement of Klamath (the "Klamath Operating Agreement") states, in relevant part:
Neither the Manager nor any of its Affiliates shall sell, transfer or convey any property to, or purchase any property from, the Company, directly or indirectly, except pursuant to transactions that are fair and reasonable to the Company; provided, however, that the requirements of Section 7.6(e) shall be deemed to be satisfied as to ... any transactions approved by Special Approval. [61]
The Klamath Operating Agreement defines "Special Approval" as having the "meaning assigned to such term in" the Amended and Restated Agreement of Limited Partnership of U.S. Timberland Company, L.P.[62] The latter agreement defines Special Approval as "approval by a majority of the members of the Conflicts Committee." [63] In addition, the Complaint alleges that the transactions were approved by Messrs. Abramson and Wyman, and the Complaint separately alleges that these two men were the members of the three person Conflicts Committee. From this, the defendants conclude that the Conflicts Committee approved the transactions and, therefore, the transactions are deemed "fair and reasonable."
The defendants' characterization of this defense, however, is much too simplistic. Whether some decision of the Conflicts Committee will be entitled to judicial deference is a complex issue of fact. The defendants will have to show, most fundamentally, that the Conflicts Committee actually met and authorized the transactions at issue. That approval is not alleged in the Complaint and cannot be assumed on a motion to dismiss. For these reasons, the motion to dismiss the fiduciary duty claims on the basis of the Operating Agreement must be denied.

F. Does The Indenture Bar The Claims Against The Individual Defendants And Certain Entity Defendants?

The Indenture contains a standard no-recourse provision, section 11.9.[64] *950 Generally, no-recourse provisions bar claims against the directors of an issuer.[65] The parties differ markedly as to whether the no-recourse provision of the Indenture bars non-contractual claims as well as claims based on a violation of the Indenture.
In support of their contention that the no-recourse provision bars non-contractual claims, the defendants inexplicably cite several authorities dealing with no-action clauses,[66] but cite no cases applying a no-recourse provision to bar non-contractual claims in a suit by an indenture trustee. In contrast, the Trustee cites several cases restricting no-recourse provisions to bar only contractual claims against the directors of an issuer. [67] And, while (also inexplicably) not cited by either party, this court has consistently said the same.
In Geyer, a promissory note contained a no-recourse provision stating that "no officer, director or agent of the Obligor shall have any liability hereunder ... but, instead, all parties shall look solely to the property and assets of Obligor for satisfaction of claims of any nature arising under or in connection with [the note]." [68] The Geyer court determined that the provision barred only contractual claims.[69]
In Mabon, Nugent & Co. v. Texas American Energy Corp.,[70] a trust indenture contained a no-recourse provision stating that "no recourse shall be had for the payment of the principal or premium ... on any Debenture or for any claim based thereon or otherwise in any manner in respect thereof, or in respect of this Indenture ... all such liability being expressly waived and released...." [71] Again, this court determined that the no-recourse provision applied only to contract claims.[72] In limiting the provision, the Mabon court explained that "restrictive indenture provisions have been enforced by our courts where the claim is one for breach of contract." [73] The court further explained that "equitable claims [were] not barred by the Indenture." [74]
The reasoning behind these authorities is clear. The directors of an issuer should not be able to immunize themselves from a *951 future breach of fiduciary duties or fraudulent conduct through a provision in the trust indenture. To allow the directors of an issuer to do so could encourage fraud by directors. Courts are quite reasonably reluctant to allow directors to preemptively exculpate themselves in this way.
Furthermore, the defendants' contention that section 11.9(c) of the Indenture, the securities law exception to the no-recourse provision, expands the protections of the no-recourse provision to cover non-contractual claims is a non-starter. As stated above, language substantially the same as sections 11.9(a) and 11.9(b) has been held to bar only non-contractual claims. [75] The court sees no reason why section 11.9(c) would change or modify the plain language of sections 11.9(a) and 11.9(b). It obviously just emphasizes that the no-recourse provision does not apply to federal securities claims.
It is uncontested, however, that section 11.9 bars contractual claims against the Individual Defendants. Therefore, the contractual claims against the Individual Defendants will be dismissed.

G. Are The Claims Barred By Equitable Estoppel And Laches?

A claim may be barred by principles of estoppel when a party's conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment.[76] To establish an estoppel, it must be shown that the party claiming estoppel lacked knowledge and the means of learning the truth of the facts in question, that he relied on the conduct of the party against whom the estoppel is claimed, and that he suffered a prejudicial change of position in consequence thereof.[77]
Laches is an equitable defense based on the theory that a person with knowledge of an impending transaction should not be permitted to sit by in silence while potential adversaries fundamentally change their positions and the rights of third parties accrue.[78] The essential elements of laches are: (1) the plaintiff must have knowledge of the claim and (2) there must be prejudice to the defendant arising from an unreasonable delay by the plaintiff in bringing the claim.[79]
The issues of whether the defendants relied upon the actions of the Trustee, and whether they were prejudiced by such reliance, are both issues of fact. They cannot properly be decided on a motion to dismiss. Therefore, the motion to dismiss on these grounds is denied. [80]

*952 IV.
The Trustee has moved for partial summary judgment pursuant to Rule 56 with respect to the $40,500,000 worth of timberlands transferred to Yakima in 1999 and 2001. These transfers took place before Yakima's Original Operating Agreement was amended. Specifically, the Trustee seeks an order that an Event of Default exists under section 4.10 of the Indenture. As discussed, supra, section 4.10 of the Indenture precludes Klamath, and its Restricted Subsidiaries, from incurring liens on Klamath's assets, unless the noteholders are provided an equal and ratable lien in those assets.
In support of its motion, the Trustee has introduced the affidavits of Nathaniel J. Zylstra (the "Zylstra Aff.") and Lawrence J. Bell (the "Bell Aff.") detailing the factual circumstances surrounding the transfers of assets from Klamath to Yakima and the imposition of a lien upon those assets. These factual allegations are documented in the Issuer's SEC filings, attached as exhibits to the affidavits.
The defendants rest their opposition to the summary judgment motion on legal argument and have done nothing to show that a material issue of fact is in dispute. Thus, the court will determine whether, based on the undisputed factual record, the Trustee is entitled to partial summary judgment as a matter of law.
On a motion pursuant to Rule 56, summary judgment will be granted where the moving party demonstrates that there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. [81] The burden is on the moving party to prove an absence of a material issue of fact and the court must review all evidence in the light most favorable to the non-moving party.[82] However, if the moving party puts into the record facts which, if undenied, entitle it to summary judgment, the burden shifts to the defending party to dispute the facts by affidavit or proof of similar weight; [83] i.e. the party opposing summary judgment is obliged to adduce some evidence showing the existence of a dispute of material fact.[84] Rule 56(e) states in relevant part:
When a motion for summary judgment is made and supported as provided in this Rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

A. Undisputed Facts Contained In Affidavits And The Defendants' Documents

In October 1999, Klamath contributed timberlands having a reported value of $22 million to Yakima in return for preferred equity interests. [85] Following *953 the transfer, Yakima obtained a revolving bank line of credit and a term note from the Bank of Montreal.[86] These instruments provided for borrowing of up to $60 million.[87] In return for this line of credit, the Bank of Montreal placed a lien on all of Yakima's assets, including the timberlands transferred from Klamath.[88] By the end of the 1999, Yakima had borrowed $58 million from this financing arrangement.[89] The senior notes were not secured equally and ratably with the Bank of Montreal lien.[90]
On October 4, 1999, Yakima filed a Deed of Trust in Klamath County, Oregon encumbering certain real property owned by Yakima for the benefit of the Bank of Montreal.[91] The property encumbered included the land contributed to Yakima by Klamath.[92]
On February 26, 2001, and again on June 30, 2001, Klamath contributed additional timberlands and cutting rights valued at $12 million and $6.5 million, respectively, to Yakima.[93] Klamath received additional equity interests in Yakima for such transfers.[94] These timberlands and cutting rights were also pledged as collateral to the Bank of Montreal. [95]
Thus, by the time of the June 30, 2001 transfer, Klamath had transferred $40,500,000 worth of timberlands and cutting rights to Yakima, and Yakima had pledged all of these assets as collateral to the Bank of Montreal.
On September 14, 2001, Yakima repaid the bank credit facility with the Bank of Montreal and received a release of the liens on the encumbered assets. [96] However, on the same day, and as part of an interrelated series of transactions, Yakima entered into a new credit facility, insured by MBIA Insurance Corporation, and again encumbered the assets.[97] The assets have remained encumbered to this day. In connection with this refinancing, Rudey executed and signed the Amended Operating Agreement on behalf of Klamath, Yakima, and Holdings.[98] The Amended Operating Agreement purported to eliminate Klamath's voting rights in Yakima.[99]

B. Discussion

The Trustee's argument in support of partial summary judgment is easily summarized. At the time of the transfers at issue, Yakima was a Restricted Subsidiary of Klamath. Klamath transferred assets covered by the Indenture to Yakima. Yakima then encumbered these assets, in *954 violation of section 4.10 of the Indenture. The assets have remained encumbered to this day. Furthermore, because Klamath failed to cure that violation when notice was duly given, an Event of Default has occurred and is continuing. Therefore, the Trustee is entitled to a finding that an Event of Default exists under the Indenture.
In response, the defendants contend that section 4.10 does not apply because Yakima was not a Subsidiary of Klamath. For the reasons already set forth, the court rejects that argument. The defendants also argue that the claim is moot and that the motion for partial summary judgment should be rejected as an improper request for an advisory opinion. The factual bases for this argument are (1) Rudey's execution (in numerous capacities) of the Amended Operating Agreement purporting to eliminate Klamath's voting rights in Yakima, and (2) the contemporaneous refinancing of the Yakima debt to (a) eliminate the asset lien in favor of the Bank of Montreal and (b) replace it with a similar lien in favor of a new lender. The defendants argue that, through some unexplained mechanism, these acts render moot any claim under section 4.10 arising out of the imposition of a lien on the assets of a Restricted Subsidiary.
The court is puzzled by this argument. Surely the defendants cannot be suggesting that the refinancing, which simply replaced one lien with another, cured a default under the Indenture that arose when the transferred assets were first pledged in violation of section 4.10. Just as obviously, the defendants cannot seriously contend that the mere act of purporting to amend the Yakima operating agreement could cure the default, as if Yakima and the Klamath assets it held were no more than a pea and the governing provisions of the Indenture merely a shell game or a confidence trick. To cure the default under the Indenture, the defendants needed to bring Yakima into compliance with section 4.10 of the Indenture. This could have been done, for example, by releasing the lien on the assets (and keeping it off) or by providing the noteholders an equal and ratable security in those assets. This did not happen.
In any event, the defendants' mootness argument fails. A case is moot when the controversy between the parties no longer exists, such that a court can no longer grant relief in the matter.[100] A matter may become moot if the legal issue in dispute is no longer amenable to a judicial resolution, or if a party has been divested of standing.[101] For example, in a case cited by the defendants, the Supreme Court declined to hear an appeal because it was rendered moot by a settlement between the parties. [102]
Here, there is no question of mootness. Clearly, a controversy exists between the parties. A decision by this court that the defendants violated the Indenture by placing a lien on the Yakima's assets would affect the legal rights of the parties because the lien still exists. At no time have the properties not been subject to a lien. Whether the lien is held by the Bank of Montreal or by some other lender would seem immaterial to the issue of breach. In either case, if this court finds that the imposition of a lien was contrary to section 4.10, the defendants would not only have violated the Indenture, but would continue *955 to be in violation of it. Therefore, this case is clearly not moot.
Because Yakima was a Restricted Subsidiary of the Issuer, the placement of a lien on the transferred assets, without providing an equal and ratable security interest to the noteholders in those assets, violated the Indenture. That violation has never been cured and has ripened into an Event of Default. On the undisputed factual record before the court, the Trustee is entitled to an award of partial summary judgment to that effect.

V.
For the foregoing reasons, the defendants' motion to dismiss the contractual claims against the Individual Defendants is granted. In all other respects, the motion to dismiss is denied. The plaintiff's motion for partial summary judgment is granted. The plaintiff is directed to submit an order within 10 days of the date hereof, on notice to the defendants.
NOTES
[1] Unless otherwise noted, the facts recited in this opinion are taken from the well-pleaded allegations of the amended complaint.
[2] The plaintiff is the successor in interest of State Street Bank and Trust Company, the original indenture trustee.
[3] On or about December 9, 2003, the Issuer changed its name to Inland Fiber Group, L.L.C.
[4] On or about November 19, 2003, Services changed its name to Timber Resource Services, L.L.C.
[5] On or about November 9, 2003, Finance changed its name to Fiber Finance Corp.
[6] On or about November 19, 2003, Holdings changed its name to Cascade Resource Holdings Group, L.L.C.
[7] On or about December 24, 2003, Yakima changed its name to American Forest Resources, L.L.C.
[8] Rudey is also the chairman, CEO, and president of Services. Rudey formed Klamath in 1996.
[9] Abramson and Wyman are also members of the Conflicts Committee of Services.
[10] The complaint alleges the following: (i) Rudey owns the three limited liability companies that constitute Holdings; (ii) Holdings owns 99% of U.S. Timberlands Company, L.P. (the "Partnership"); (iii) until July 2003, Klamath was 99% owned by the Partnership and 1% owned by Services; and (iv) Holdings and the Partnership together indirectly own Yakima.
[11] The plaintiff filed a first amended complaint and answering brief after the defendants filed a motion to dismiss the original complaint and an opening brief in support of that motion. The defendants thereafter filed a motion to dismiss the first amended complaint on the same grounds as had supported the motion to dismiss the original complaint.
[12] On September 14, 2001, Rudey executed an Amended and Restated Operating Agreement for Yakima (the "Amended Operating Agreement") that eliminated the Issuer's voting interest in Yakima. Rudey, the President, CEO, and controlling person of all the parties to the Amended Operating Agreement, executed, and signed the Amended Operating Agreement on behalf of Klamath, Yakima, and Holdings.
[13] The Complaint alleges at ¶ 46 that, at the end of the third quarter 2002, the Issuer's liabilities exceeded its assets by over $6 million; at year end 2002, by approximately $20 million; at the end of the first quarter 2003, by over $28 million; at the end of the second quarter 2003, by over $37 million; at the end of the third quarter 2003, by over $47 million; at the end of the fourth quarter 2003, by over $65 million; at the end of the first quarter 2004, by over $78 million; and at the end of the second quarter 2004, by over $91 million.
[14] The notice given pursuant to § 6.6 was made more than 60 days after the Trustee sent the notice of default. Therefore, an Event of Default had accrued and was continuing.
[15] Pursuant to § 11.11 of the Indenture, New York law governs.
[16] Kohls v. Kenetech Corp., 791 A.2d 763, 767 (Del.Ch.2000).
[17] Grobow v. Perot, 539 A.2d 180, 188 n. 6 (Del.1988).
[18] Id.
[19] Id.
[20] In re Lukens Inc. Shareholders Litig., 757 A.2d 720, 727 (Del.Ch.1999).
[21] U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, L.L.C., 2004 WL 1699057 (Del.Ch. July 29, 2004).
[22] Id. at *3.
[23] Id. at *2.
[24] 1989 WL 55070 (Del.Ch. May 23, 1989).
[25] The defendants also cite several non-Delaware cases for the proposition that the Trustee should not be allowed to cure its lack of standing. Their reliance on these authorities is misplaced.

In Orlando Sports Stadium, Inc. v. Sentinel Star Co., 316 So.2d 607 (Fla.Ct.App.1975), the court held that, due to a Florida statute, a party bringing a libel suit must notify the presumptive defendant beforehand. The plaintiff in that case had not done so and the court refused to grant it leave to amend the complaint. This case is simply inapposite to the case at bar.
In State v. 2018 Rainbow Drive, 740 So.2d 1025 (Ala.1999), a city brought a condemnation proceeding pursuant to an Alabama statute. However, the statute only allowed the state to bring such a proceeding. The court did not allow the parties to amend the complaint and name the state as a party. This case, too, is inapposite.
[26] In his learned article on the subject, Marcel Kahan, Rethinking Corporate Bonds: The Trade-off Between Individual and Collective Rights, 77 N.Y.U. L.REV. 1040, 1049 (2002), Prof. Kahan drew the distinction this way:

A "default" basically includes any breach of a provision in the indenture. A breach of the indenture other than a payment default generally becomes an "Event of Default" only if either the trustee or holders of 25% of the bonds give a "Notice of Default" to the company and the company fails to cure the default within a specified time period.
[27] Compl. ¶ 71.
[28] See Meckel v. Cont'l Resources, Co., 758 F.2d 811, 816 (2d Cir.1985) ("Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement.").
[29] See Cont'l Bank, N.A. v. Caton, 1990 WL 129452, at *4 (D.Kan. Aug.6, 1990) ("Whether the Trustee has the authority to bring the claims in this suit on behalf of the bondholders must be decided from the terms of the Trust Indenture. The rights and powers of the Trustee are a function of the Trust Indenture and cannot be generally expanded in contradiction of the Indenture by reference to broad common law principles."); Central Bank of Denver, N.A. v. Deloitte & Touche, 928 P.2d 754, 755 (Colo.Ct.App.1996) ("Whether an indenture trustee is authorized to sue is determined by the terms of the indenture of trust.").
[30] See Feldbaum v. McCrory Corp., 1992 WL 119095, at *7 (Del.Ch. June 2, 1992); Lange v. Citibank, N.A., 2002 WL 2005728, at * 7 (Del.Ch. Aug.13, 2002).
[31] Section 6.6 of the Indenture states:

A Holder of Notes may pursue a remedy with respect to this Indenture or the Notes only if:
(a) the Holder gives to the Trustee written notice of a continuing Event of Default or the Trustee receives such notice from either Issuer;
(b) the Holders of at least 25 percent in principal amount of the then outstanding Notes make a written request to the Trustee to pursue the remedy;
(c) such Holder or Holders offer and, if requested, provide to the Trustee indemnity satisfactory to the Trustee against any loss, liability, or expense;
(d) the Trustee does not comply with the request within 60 days after receipt of the request and the offer and, if requested, the provision of indemnity; and
(e) during such 60-day period the Holders of a majority in principal amount of the then outstanding Notes do not give the Trustee a direction inconsistent with the request.
A Holder of Notes may not use this Indenture to prejudice the rights of another Holder of Notes or to obtain a preference or priority over another Holder of Notes.
[32] Feldbaum, 1992 WL 119095, at *6 (quoting the American Bar Foundations Commentaries on Indentures, 5.7, at 232 (1971)).
[33] Feldbaum, 1992 WL 119095, at *6.
[34] Id. at *8; accord Lange, 2002 WL 2005728, at *7 ("To the extent [the company] was insolvent, its directors may have owed fiduciary duties to the Debentureholders as a class, and such duties may be enforced in an action by the Indenture Trustee.").
[35] Regions Bank v. Blount Parrish & Co., 2001 WL 726989, at * 9 (N.D.Ill. June 27, 2001). The opinion in Regions Bank does not specify what law the District Court is applying. Therefore, this court assumes that the District Court was applying Illinois law, the law of the state in which it sits.
[36] Id. at *5.
[37] Id.; see also Nationsbank, N.A. v. McGraw-Hill Co., 1996 U.S. Dist. LEXIS 22414, at *23-*24 (D.Tex.1996) ("Under the Trust Indenture, the bondholders surrendered their right to sue independently to recover on the bonds.... The Indenture does not state that the bondholders surrendered their right to sue independently for losses caused by a third-party's tort. This court cannot read an additional term into the Trust Indenture.").
[38] Regions Bank, 2001 WL 726989, at *7.
[39] Prof. Kahan described the quandary facing the noteholders in this way:

[T]he broad interpretation courts have given to the no-action clause makes the enforcement system for some claims unworkable. Courts have held that holders must comply with the no-action clause to vindicate most noncontractual rights. But a violation of these rights cannot result in an "Event of Default" and compliance with the no-action clause is therefore impossible. Moreover, courts have denied the trustee standing to assert noncontractual rights of bondholders. As a result, it would appear that neither bondholders nor the trustee can bring such noncontractual claims.
Rethinking Corporate Bonds, supra note 25, at 1070.
Prof. Kahan's solution to this quandary is two-fold. First, he argues that courts should reinterpret no-action clauses to relate only to contractual claims by the noteholders. Second, he argues for contractual modifications so that less reliance is placed on the indenture trustee to enforce the rights of the bondholders. Id. at 1082.
Fortunately, the quandary discussed by Prof. Kahan is not found in the present case since the Complaint alleges both the existence of an Event of Default and a proper demand by noteholders. In any event, the court notes that valid policy reasons favor the court's interpretation of the interaction between the no-action clause (section 6.6) and remedies clause (section 6.3). First, as the former Chancellor lucidly explained in Feldbaum, no-action clauses deal with the problems of collective action and strike suits by bondholders. These advantages would be greatly reduced if an individual bondholder could avoid the requirements of the no-action clause by bringing a non-contractual claim.
Second, interpreting the no-action clause to exclude non-contractual claims would lead to inefficient claim-splitting. The interaction of the no-action clause, which requires a noteholder to demand the trustee bring all contractual claims, and the requirement that the noteholder herself bring the non-contractual claims, would lead to a situation where contractual and non-contractual claims on an indenture would have to be brought by different plaintiffs, possibly in different fora. This is not an efficient use of judicial resources.
[40] Section 4.8 of the Indenture states, in pertinent part:

The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or in any manner become directly or indirectly liable, contingently or otherwise, for the payment of (in each case, to "incur"), any Indebtedness ... unless at the time of such incurrence, and after giving pro forma effect to the receipt and application of the proceeds of such Indebtedness, the Consolidated Fixed Charge Coverage Ratio of the Company is greater than 2.25 to 1.
[41] Section 4.10 of the Indenture states, in pertinent part:

The Company will not, and will not permit any of its Restricted Subsidiaries to create, incur, assume or suffer to exist any Liens, other than Permitted Liens, upon any of its respective property or assets, whether owned on the Issue Date or thereafter acquired, unless the Notes and the Subsidiary Guarantees, as applicable, are secured equally and ratably with (or prior to, in the case of the Subordinated Indebtedness) the obligations secured by such Lien.
[42] The Indenture defines a Restricted Subsidiary as a Subsidiary of the company that is not an "Unrestricted Subsidiary." The Indenture defines an Unrestricted Subsidiary as Subsidiary of the company that is designated as such, whose debt is not secured by the company, and who cannot incur liens on the company's assets. Neither party alleges that Yakima is an Unrestricted Subsidiary.
[43] Klamath certainly did have the power to control certain aspects of the management of Yakima. It could use its 51% voting power to control the outcome of the vote with respect to: (i) the approval of any action by the manager to amend the certificate of formation (§ 7.3(e)), (ii) the addition of additional or substitute members (§§ 10.1 & 10.2), (iii) the reconstruction of Yakima following a dissolution (§ 12.2), and (iv) the approval of compensation to a liquidator (§ 12.3). In addition, Klamath had the right to vote on, but could not control the outcome of: (i) an election to dissolve Yakima (§ 12.1), and (ii) amendments to the Original Operating Agreement that were not reserved to the manager.
[44] Angelo, Gordon & Co., L.P. v. Allied Riser Communs. Corp., 822 A.2d 1065, 1070 (Del.Ch.2002) (citation omitted).
[45] Id. at 1071.
[46] Defs.' Reply Br. In Supp. of Mot. to Dismiss at 14.
[47] Compl. ¶ 30.
[48] The Indenture contains the following definition of Affiliate:

"Affiliate" means, with respect to any specified Person, (a) any other Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person or (b) any other Person who is a director or executive officer of (i) such specified Person or (ii) another other Person described in the preceding clause (a). For purposes of this definition, control shall mean the power to direct management and policies, whether through the ownership of voting securities, by contract or otherwise; provided, that beneficial ownership of 10% or more of any class, or any series of any class, of Capital Stock of a Person, whether or not Voting Stock, shall be deemed to be control.
[49] The court assumes for argument's sake, without so holding, that at the time these subsequent transactions were made, Yakima was an Affiliate of Klamath.
[50] The relevant part of the definition of a "Permitted Investment" contained in the Indenture is as follows:

[T]he making or ownership of by the Company or any Restricted Subsidiary of Investments ... in any Person which is engaged in substantially the same business as the Company, provided that the aggregate amount of all such Investments made by the Company and its Restricted Subsidiaries ... shall not at any date of determination exceed 10% of Total Assets (the "Investment Limit"), provided that, in addition to Investments that would be permitted under the Investment Limit, during any fiscal year the Company and its Restricted Subsidiaries may invest up to $11 million (the "Annual Limit") pursuant to the provisions of this subdivision (c), but the unused amount of the Annual Limit shall not be carried over to any future years[.]
[51] Section 4.11 provides, in pertinent part:

The Company will not, and will not permit any of its Subsidiaries to ... enter into ... any transaction or series of related transactions ... with or for the benefit of an Affiliate of the Company, unless ... such transaction or series of related transactions is on terms no less favorable to the Company... than those which would have been obtained in a comparable transaction at such time from Persons who are not Affiliates of the Company ... provided, however, that this Section 4.11 will not apply to ... transactions permitted by the provisions of the Indenture set forth in Section 4.9 hereof....
[52] Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd., 2004 WL 1444868, at *5 (S.D.N.Y. June 25, 2004); accord Kaiser Aluminum Corp. v. Matheson, 681 A.2d 392, 395 (Del.1996).
[53] See, e.g., Village Nursing Home v. Axelrod, 146 A.D.2d 382, 390, 541 N.Y.S.2d 377 (N.Y.App.Div.1989) ("In construing a contract, the agreement is to be read as a whole and every part will be interpreted with the whole in seeking to give each clause its intended purpose in the promotion of the primacy and dominant purpose of the contract.").
[54] Odyssey Partners, L.P. v. Fleming Cos., 735 A.2d 386, 417 (Del.Ch.1999); Geyer v. Ingersoll Publications Co., 621 A.2d 784, 787 (Del.Ch.1992) ("[D]irectors do not owe creditors duties beyond the relevant contractual terms absent `special circumstances ... e.g., fraud, insolvency, or a violation of a statute....'") (internal citations omitted).
[55] Geyer, 621 A.2d at 787. For a thoughtful analysis of the nature of the fiduciary duties that the directors of a Delaware corporation owe to the company's creditors when the company becomes insolvent, see Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 786-795 (Del.Ch.2004).
[56] Geyer, 621 A.2d at 789 (internal citations omitted).
[57] Id.; see also McDonald v. Williams, 174 U.S. 397, 403, 19 S.Ct. 743, 43 L.Ed. 1022 (1899) (defining an insolvent corporation as one in which the value of its assets has sunk below the amount of its debts).
[58] In re NCS Healthcare, Inc., S'holders Litig., 825 A.2d 240, 257 (Del.Ch.2002), rev'd sub nom. on other grounds, Omni Care, Inc. v. NCS Healthcare, Inc., 822 A.2d 397 (Del.2002); see also Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp., 1991 WL 277613, at *34 (Del.Ch. Dec.30, 1991) (finding directors did not breach their fiduciary duties when they considered the interests of the entire corporate enterprise as well as the interests of a 98% stockholder when the corporation was in bankruptcy); Geyer, 621 A.2d at 789 ("The existence of fiduciary duties at the moment of insolvency may cause directors to choose a course of action that best serves the entire corporate enterprise rather than any single group....").
[59] Nancy A. Peterman & Sherri Morissette, Director's Duties in the Zone of Insolvency: The Quandary of the Nonprofit Corp., 23-MAR AM. BANKR.INST. J. 12 (Mar.2004); see also Credit Lyonnais Bank Nederland, N.V., 1991 WL 277613 at *34 ("[W]here a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent of the residue risk bearers, but owes its duty to the corporate enterprise."); Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.), 208 B.R. 288, 300 (Bankr.D.Mass.1997) ("When a transaction renders a corporation insolvent, or brings it to the brink of insolvency, the rights of creditors become paramount.").
[60] At oral argument, counsel for the defendants stated that all interest payments that have come due since the November 2003 payment have been paid on time. Counsel for the Trustee did not dispute this statement.
[61] Def.'s Ex. N at 34.
[62] Id. at 9.
[63] Def.'s Ex. O at 19.
[64] Section 11.9 of the Indenture states:

(a) No member of the Company or director, officer, employee, partner or stockholder of the Master Partnership, the Manager, Finance Corp. or any Subsidiary Guarantor, as such, shall have any liability for any obligations of the Issuers and Subsidiary Guarantors under the Notes, the Subsidiary Guarantors or this Indenture or for any claim based on, in respect of or by reason of such obligations. Each Holder of Notes, by accepting a Note, waives and releases all such liability. This waiver and release shall be part of the consideration for the issuance of the Notes.
(b) Except as provided for in any Subsidiary Guarantee, the obligations of the Issuer under this Indenture and Notes will be non-recourse to the Manager and the Master Partnership (and their respective affiliates (other than the Issuers)) and payable only out of the cash flow and assets of the Issuers. The Trustee agrees, and each Holder of a Note, by accepting a Note, will be deemed to have agreed in this Indenture that neither the Manager nor its assets nor the Master Partnership nor its assets (nor any of their respective affiliates (other than the Issuers) nor their respective assets) shall be liable for any of the obligations of the Issuers under this Indenture or the Notes (except as provided for by any Subsidiary Guarantee). In addition, neither the Manager nor the Holders of Notes will have any right to require the Company to make distributions to the Master Partnership.
(c) Notwithstanding the forgoing, nothing in this provision shall be construed as a waiver or release of any claims under the federal securities laws.
[65] LaSalle Nat'l Bank v. Perelman, 141 F.Supp.2d 451, 459 (D.Del.2001).
[66] Lange, 2002 WL 2005728, at *5 (holding that no-action clauses barred debentureholder from bringing noncontractual claims); Feldbaum, 1992 WL 119095, at *8 (same); Victor v. Riklis, 1992 WL 122911, at *4 (S.D.N.Y. May 15, 1992) (dismissing fraudulent conveyance claims brought by noteholder for failure to comply with no-action clause); Levy v. Paramount Publix Corp., 149 Misc. 129, 133-134, 266 N.Y.S. 271 (N.Y.Sup.Ct.1933), aff'd, 265 N.Y. 629, 193 N.E. 418 (1934) (dismissing fraudulent conveyance claims brought by bondholders for failure to comply with no-action clause).
[67] See, e.g., LaSalle, 141 F.Supp.2d at 459; Bankers Trust Co. v. Hale & Kilburn Corp., 84 F.2d 401, 405 (2d Cir.1936).
[68] 621 A.2d 784, 793 n. 6 (Del.Ch.1992).
[69] Id.
[70] 1988 WL 5492 (Del. Ch. Jan 27, 1988).
[71] Id. at *3.
[72] Id.
[73] Id.
[74] Id.
[75] See Mabon, 1988 WL 5492, at *3.
[76] Wilson v. Am. Ins. Co., 209 A.2d 902, 903-04 (Del.1965); Wolf v. Globe Liquor Co., 103 A.2d 774, 776 (Del.1954).
[77] Wilson, 209 A.2d at 904; Wolf, 103 A.2d at 776.
[78] Fike v. Ruger, 752 A.2d 112, 113 (Del.2000).
[79] Id.
[80] In addition, the defendants argue that the claims for breach of fiduciary duty and fraudulent conveyance must be dismissed because the prospectus for the notes specifically informed the noteholders that the defendants could engage in the transactions at issue.

Generally, matters outside of the pleadings should not be considered in ruling on a Rule 12(b)(6) motion to dismiss. Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, 691 A.2d 609, 612 (Del.1996). However, when either (1) the document is integral to a plaintiff's claim and incorporated into the complaint, or (2) the document is not being relied upon to prove the truth of its contents, it may be appropriate for the Court of Chancery to consider documents other than the complaint when ruling on a Rule 12(b)(6) motion. Id.
The prospectus upon which the defendants rely was not incorporated into the Complaint. In fact, the prospectus upon which the defendants purportedly rely was never put before the court in any form. Therefore, it would be inappropriate for the court to dismiss based on this document.
[81] Scureman v. Judge, 626 A.2d 5, 10 (Del.Ch.1992).
[82] Id. at 10-11.
[83] Tanzer v. Int'l Gen. Indus., Inc., 402 A.2d 382, 385 (Del.Ch.1979).
[84] Id.
[85] Form 10-K for fiscal year ending Dec. 31, 1999 filed by U.S. Timberlands Klamath Falls, LLC, attached to Zylstra Aff. Ex. D at 33-34.
[86] Form 10-K for fiscal year ending Dec. 31, 2000 filed by U.S. Timberlands Klamath Falls, LLC, attached to Zylstra Aff. Ex. B at 9.
[87] Id.
[88] Id.
[89] Id. at 10.
[90] Bell Aff. ¶ 6.
[91] Line of Credit Deed of Trust, Fixture Filing and Security Agreement with Assignment of Rents, attached to Zylstra Aff. Ex. L.
[92] Form 10-K for fiscal year ending Dec. 31, 2000 filed by U.S. Timberlands Klamath Falls, LLC, attached to Zylstra Aff. Ex. B at 8-9.
[93] Form 10-Q for quarterly period ending Mar. 31, 2001 filed by U.S. Timberlands Klamath Falls, LLC, attached to Zylstra Aff. Ex. F at 7.
[94] Id.
[95] Id.
[96] Form 10-K for fiscal year ending Dec. 31, 2002 filed by U.S. Timberlands Klamath Falls, LLC, Def. Ex. H at 89.
[97] Id.
[98] Amended Operating Agreement at 52.
[99] Id.
[100] Mentor Graphics Corp. v. Shapiro, 818 A.2d 959, 963 (Del.2003).
[101] Id.
[102] Glazer v. Pasternak, 693 A.2d 319, 321 (Del.1997).